## COMMONWEALTH vs. BARRY J. JACOBSON
(and a companion case[1]).

Berkshire. March 5, 1985. — April 22, 1985.

Present: GREANEY, C.J., GRANT, & DREBEN, JJ.

*Burning a Dwelling House. Practice, Criminal,* Grand jury proceeding, Conduct of prosecutor, Argument by prosecutor, Instructions to jury, Deliberation of jury. *Evidence,* Relevancy and materiality, Consciousness of guilt, Chain of custody. *Jury and Jurors.*

At the trial of a defendant charged with burning a dwelling house belonging to him there was sufficient circumstantial evidence, including evidence of motive, opportunity, control of the premises, increase in insurance, concealment and misleading statements to warrant the defendant's conviction. [673-674]

At the trial of a defendant and a codefendant charged with burning a dwelling house belonging to the defendant, evidence of the circumstances in which the codefendant had been present at the scene of the fire with the defendant was insufficient to warrant the codefendant's conviction. [674-676]

Failure of a prosecutor seeking an arson indictment to disclose certain inconclusive evidence to the grand jury did not require dismissal of the indictment where, on the whole, the case was fairly presented to the grand jurors and the indictment was warranted by the evidence. [676-678]

At the trial of a defendant charged with burning a dwelling house belonging to him, the judge did not abuse his discretion in excluding, on the ground of remoteness, evidence that on two occasions, each more than six weeks before the fire, a security company had gone to the house to investigate burglar alarms and had discovered fresh foot prints leading into the woods, an unlocked door, and a thermostat set at 80°. [678-679]

There was no merit to a contention made by a defendant convicted of burning a dwelling house that a fluid sample taken from certain carpeting and its chemical analysis, which disclosed a gasoline residue, should have been excluded from evidence because the prosecutor failed to authenticate the sample or to demonstrate an unbroken chain of custody. [679-680]

At the trial of a defendant charged with burning a dwelling house in order to obtain insurance proceeds, no risk of a miscarriage of justice was created

---

[1] Against Patrick Clarke.

by the prosecutor's cross-examination of defense witnesses about the defendant's financial circumstances and his closing argument on the subject. [680-681]

At the trial of a defendant charged with burning a dwelling house belonging to him, at which there was evidence that the defendant left the scene of the fire in Richmond and returned to his home in New York, despite an express request by a State police officer that he remain at the scene to assist in the investigation and the defendant's agreement to do so, the judge did not err in instructing the jury on consciousness of guilt. [681-682]

In the circumstances, the judge in a criminal case did not err in denying the defendant's motion for a new trial based upon alleged anti-Semitic remarks made by jurors during deliberations. [682-685]

INDICTMENTS found and returned in the Superior Court Department on February 10, 1983.

The cases were tried before *William W. Simons, J.*, and a motion for a new trial was heard by him.

*James D. St. Clair (Lee Johnson* with him) for Barry J. Jacobson.

*Charles R. Bennett, Jr. (Brian P. Burke* with him) for Patrick Clarke.

*Daniel A. Ford,* Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. Following a lengthy jury trial in the Superior Court, the defendants, Barry J. Jacobson and Patrick Clarke, were convicted of burning a dwelling house (G. L. c. 266, § 1) and sentenced.[2] Represented by new counsel on appeal, the defendants argue that their respective motions for required findings of not guilty, Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979), should have been allowed. We first take up the rule 25 motions filed at the conclusion of the Commonwealth's case, concluding that Jacobson's motion was properly denied but that Clarke's motion should have been allowed. We thereafter consider Jacobson's remaining contentions concluding

---

[2] Jacobson was sentenced to six months of imprisonment in a house of correction and fined $10,000. Clarke was sentenced to six months of imprisonment in a house of correction, but the sentence was suspended on probation for a period of two years. He was fined $5,000.

that the judgment of conviction and the order denying his motion for new trial should be affirmed.[3]

The evidence in the Commonwealth's case disclosed the following:

(a) On Thursday, January 28, 1982, at 6:18 A.M. and again at 6:20 A.M., a fire alarm was received by a security company from Jacobson's vacation house on Wood Lot Road in Richmond. The company's answering service attempted to reach Jacobson at his house in White Plains, New York, but the telephone number there was continuously busy. The answering service finally reached the caretaker for the property. While driving to the house at approximately 6:29 A.M., the caretaker saw Jacobson's automobile stuck in a snowbank. Jacobson flagged the caretaker down and explained that he had seen a hole in his garage door which made him think that someone was burglarizing the house. Clarke was in the automobile with Jacobson. Both men were dressed in business suits. When the caretaker asked what the defendants were doing in Richmond that early in the day, Jacobson said that they had driven from New York to obtain Jacobson's four-wheel drive jeep which Clarke wanted to borrow for the weekend.

(b) The caretaker informed Jacobson that the fire alarm had gone off at the house. Jacobson and the caretaker immediately left in the caretaker's automobile to go to the house.[4] When Jacobson and the caretaker arrived at the scene, they saw flames rushing over the top of the back part of the house. Volunteer fire fighters had begun to arrive to fight the fire. The jeep was still in the garage. Eventually, the fire fighters forced open the garage door and pushed the jeep out. The keys were not in the vehicle's ignition and the steering column was locked,

---

[3] Jacobson's other claims of error concern (1) the denial of his motion to dismiss the indictment for alleged misrepresentation of evidence to the grand jury; (2) evidentiary rulings at trial; (3) the prosecutor's trial strategy and final argument; (4) the handling of the evidence pertaining to consciousness of guilt; and (5) evidence of alleged jury misconduct, which is argued as a basis for the grant of a new trial.

[4] Clarke was left behind to attempt to dig the vehicle out of the snowbank.

making it difficult to push. The jeep had been warmed to room temperature and was covered with oily black soot. It had not caught fire.

(c) When the fire was under control, the caretaker took Jacobson and Clarke to his house to warm up. (January 28, 1982, was one of the coldest days of the winter in Berkshire County.) Jacobson tried to place a telephone call to his wife, but was unable to because the line was still busy. He also called his office to advise that he would not be coming to work. Jacobson's hands were freezing cold, grayish-white, and he had a blood blister on one finger. After the defendants warmed up, the caretaker, Jacobson, and Clarke returned to the scene of the fire.

(d) Trooper William Roche of the Massachusetts State police arrived at the scene about 8:19 A.M. Jacobson gave Roche his name and address, but gave his business rather than his home telephone number. After some general questioning, Roche asked Jacobson to stay at the scene for a minimum of two hours so that someone from the Massachusetts State police Crime Prevention and Control (CPAC) Unit could speak with him about the fire. Jacobson agreed to do so. Roche then went into West Stockbridge to call the CPAC Unit. When he returned about twenty-five minutes later, Jacobson had left and returned to New York.[5]

(e) Troopers Robert G. Scott and Richard M. Smith of the CPAC Unit arrived at the scene of the fire around 10:00 A.M. After investigation, the two troopers concluded that the origin of the fire had been in a first floor back bedroom closet, that the fire had been started by the application of an open flame to some kind of liquid fuel left or placed on the floor, and that arson had been committed.[6]

---

[5] The caretaker testified that he had suggested to Jacobson that he return to New York and that he (the caretaker) would let the State police into the house to investigate the fire.

[6] A number of factors contributed to the basis for the opinion that the fire had been incendiary in origin, including the following: presence of bright orange flames and melted copper pipe (which indicated extremely high temperatures); heavy black smoke (which indicated a high concentration of

(f) After returning to New York about 11:30 A.M., Jacobson went to a hospital in White Plains for treatment of his hands. In the emergency room, he told admitting personnel that he had received a telephone call in White Plains that morning informing him that his summer house in Richmond was on fire. Jacobson stated that he had immediately driven to Richmond and that he had been throwing snow on the garage during the fire to protect his jeep. He did not know whether his hands were frostbitten from scooping up snow or burned from pushing the jeep out of the garage.[7]

(g) There was evidence that Jacobson, in the summer of 1981, had spoken to the Richmond fire chief and inquired about the number of fire trucks then owned by the town's volunteer fire department. When told that the department had only one, Jacobson asked what would happen if a fire occurred at his house. The chief told Jacobson that he would probably lose the house because of the distance between the firehouse and the house and the fact that the one tanker could carry only 2,000 gallons of water. Jacobson told the chief that if he saw a used tanker in New York "for the right price," he would buy it for the town. However, he never did.

---

hydrocarbon fumes); disproportionate and extensive floor burns and melted aluminum on the sliding glass door track (which indicated very high floor temperatures); puddle-shaped stains on the bedroom carpeting; the nature of the charring on the window and door frames; and the presence of oily soot on the jeep (indicating that a petroleum product had been consumed in the fire).

The troopers also eliminated accidental causes by examining the electrical fixtures and the baseboard heaters for evidence of any malfunctions. They took three samples from the carpeting in the closet where they had determined that the fire had started because a hydrocarbon detector had registered fairly high readings in that area. A fluid sample squeezed from one of the carpet samples was later tested by a State police chemist and found to contain a residue of leaded gasoline. All of these circumstances were the subjects of testimony by the two troopers who qualified as experts in the investigation of arson. Their testimony was supplemented by other expert testimony from a State police chemist and numerous photographs showing the damage caused by the fire.

[7] Jacobson's problem with his hands was diagnosed and treated at the New York hospital as a case of frostbite.

(h) At 11:30 P.M., on the night of the fire, Trooper Scott questioned Clarke by telephone at his home in New York. Clarke stated that he and Jacobson had started to drive to Richmond at about 4:00 A.M. that day because Clarke wanted to borrow Jacobson's jeep. Clarke stated that he had slept during the trip and had not seen anything when the two men reached the house at about 6:00 A.M. Clarke indicated that Jacobson had tried to open the garage door with an automatic door opener but that the door had stuck. The two men were on their way down to the caretaker's house to obtain a key for the house when Jacobson's automobile went off the road. Clarke explained that the hole in the garage door must have been made by Jacobson's trying to force the door open. He claimed that Jacobson had not told him that someone might have tried to burglarize the house, but that Jacobson might have thought so because of the hole in the garage door. Clarke denied seeing or smelling any smoke while he was at the house.

(i) When the fire fighters arrived at the house, all the doors were locked. No footprints were found in the newly fallen snow leading into the nearby woods. The jury could have inferred that the defendants were the only ones who had access to the house at the time the fire broke out.

(j) The fire alarm, which, as previously noted, see (a) above, had sounded at 6:18 and again at 6:20 A.M., would have gone off twice only if someone had pushed the reset button. Jacobson was familiar with the alarm system and knew how to use the reset button. There was testimony that the caretaker had notified Jacobson that he had turned off the burglar alarm because of a malfunction. The jury could have inferred that Jacobson thought that the fire alarm had also been turned off and that he could set the fire without detection. They could also have inferred that, when Jacobson was surprised by the alarm, he tried to turn it off, but instead had inadvertently reactivated the alarm.

(k) As also noted, see (a) above, when the security company's answering service had tried to reach Jacobson at his home in White Plains, the telephone was continuously busy, and the telephone was still busy when Jacobson tried to call his

wife. The jury could have inferred that Jacobson had taken the telephone off the hook before he left White Plains that morning so that when the answering service tried to reach him they would not know that he was not at home.[8]

(1) There was evidence that Jacobson had a motive for burning the house. The property had caused him considerable annoyance and expense since he had acquired it in 1977 for $55,000. Jacobson had spent between $150,000 and $225,000 for improvements to the house when its well ran dry in the fall of 1980. The house was thereafter without water from November, 1980, to July, 1981. A court judgment required Jacobson to pay a welldigger, who had been unsuccessful in securing water for the house, $12,000 for his services. He also had to pay a second welldigger over $13,000 in order to obtain water, and he had to spend more than $25,000 to redo the landscaping which had been damaged by the drilling. In November, 1981, the home had been burglarized and approximately $22,000 worth of items had been stolen. As of the date of the fire, Jacobson's theft insurance claim had not been paid. In addition, the burglar alarm system was malfunctioning and had to be turned off, and the alarm service contract had been cancelled because Jacobson had refused to pay his bill.

(m) Finally, the jury could have also found that the property had an appraised replacement value of $212,000 and that Jacobson had increased the insurance to $400,000 in October, 1981, a few months before the fire. The jury could also have found that based on evidence of his late payment of 1982 real estate

---

[8] The jury were free to disbelieve Jacobson's deposition testimony (placed in evidence in the Commonwealth's case) that he was on his way to the caretaker's house to obtain a key and to infer instead that his vehicle had become stuck trying to flee from the scene of the arson. The jury could have noted that the road on which the vehicle became stuck led away from the house and intersected with a cross street which led to a major highway to New York. Jacobson's explanation to the caretaker that he was afraid the house was being burglarized because of the light in the window over the garage and the hole in the garage door also may have strained the jury's credulity. There was testimony that Jacobson knew that the lights were set on automatic timers in order to protect the house and that the hole in the garage door was far too small for any person to fit through.

taxes Jacobson had been experiencing at least a temporary cash flow problem.

1. *Denial of Jacobson's motion for a required finding of not guilty.* We conclude, after considering the Commonwealth's evidence in light of the standard governing a motion for required finding of not guilty, see *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979), that the prosecution met its burden of producing evidence against Jacobson sufficient to warrant his conviction of arson.

There was ample evidence in the form of expert testimony, test results, and photographs to show that the fire was incendiary in origin and that it had been started in a first floor bedroom closet where it would likely escape detection for a period of time sufficient to allow the arsonist to leave the area. Jacobson was at the house either shortly before or at the precise moment when the fire started. He had driven to Richmond on one of the coldest days of the winter, after making an unusual predawn trip from New York. If Jacobson had returned to New York, as planned, he would have been at his office by 8:30 A.M., before the start of the workday. He could not be reached at his White Plains home because the telephone there had been left off the hook. These arrangements, if successful, would have provided an alibi.

All the doors to the Richmond house were locked, and there were no footprints found leading from the house into nearby woods. This suggests that burglars or vandals had not entered the house and that whoever had set the fire had access with a key. Jacobson had knowledge of the control and operation of the fire alarm system. It could be found that the house had been a major source of annoyance to Jacobson and that there had been a considerable increase in the amount of its insurance shortly before the fire. He had inquired previously as to the ability of the town's volunteer fire fighting force to put out a fire at the house. The jury also had before it evidence of Jacobson's having left the scene, contrary to an express request by the State police to which Jacobson had agreed. This latter

evidence could have been viewed by the jury as indicative of
an attempt to impede the investigation.[9]

Of necessity, proof of arson must often rely on circumstantial
evidence because arsonists are furtive criminals. "Circumstan-
tial evidence is competent evidence to establish guilt." *Com-
monwealth* v. *Rojas,* 388 Mass. 626, 629 (1983). We think
that "a sufficient 'chain of circumstances' — composed of
evidence of motive, opportunity, control of the premises, in-
crease in insurance, concealment and misleading statements
— was forged, allowing the [jury] to find that [Jacobson] . . .
willfully and maliciously set the fire." *Commonwealth* v. *De-
Stefano,* 16 Mass. App. Ct. 208, 217 (1983).[10]

2. *Denial of Clarke's motion for a required finding of not
guilty.* We conclude, under the *Latimore* standard, *supra,* that
the prosecution's proof against Clarke was, at the end of the
Commonwealth's case, insufficient to sustain Clarke's convic-
tion.

There was evidence that Jacobson and Clarke were friends,
that Clarke had done construction work for Jacobson, and that
Clarke had been at the scene with Jacobson when the fire
started. There were, however, none of the circumstantial indicia
generally considered significant in arson cases to link Clarke
to participation in the crime. See *Commonwealth* v. *Ward,* 14
Mass. App. Ct. 37, 40-41 (1982). Clarke held no ownership
interest in the property. There was no evidence that Clarke had

---

[9] There was also evidence of Jacobson's having made misleading state-
ments to hospital personnel in New York, see (f) above. The misleading
statements could have been considered by the jury as additional support for
a conclusion that Jacobson was attempting to cover-up arson.

[10] There was also no error in the judge's denial of Jacobson's renewed
motion for a required finding of not guilty at the conclusion of all the
evidence. See *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 (1976). The
evidence in the defense case contradicted the prosecution's evidence by
giving an explanation for most of the circumstances upon which the pros-
ecutor relied to establish Jacobson's guilt. The explanations did no more
than raise conflicting issues of fact and credibility which were for the jury
to resolve. In fact, there may have been some strengthening of the prosecu-
tion's case, when evidence was introduced by the defense showing that
Jacobson owed over $60,000 in Federal income taxes.

a motive to burn the property, or evidence that he would have gained anything financially from the crime. Also lacking was evidence that Clarke was financially hard pressed, or evidence demonstrating consciousness of guilt on Clarke's part.

There was no real need for a lookout in the remote area of Richmond where the house was located. There was nothing in the way the fire was set to indicate that two men were needed to start it. Clarke stayed at the scene, voluntarily answered all police questions about the incident, and did not attempt to evade the investigation. Clarke did not install the alarm system and does not appear to have known anything about its operation. There was also no proof of major financial involvement between Clarke and Jacobson. The evidence of Clarke's presence at the scene, and of some kind of business relationship or friendship with Jacobson, is too meagre in our view to provide a basis for Clarke's conviction. See *Commonwealth* v. *Murphy,* 1 Mass. App. Ct. 71, 77 (1973), and cases cited.

The Commonwealth argues that the jury could have inferred Clarke's guilt based on testimony that Clarke had done some work at the house and that knowledge of its construction might have proved helpful in starting the fire. However, the prosecutor did not establish in any detail what type of work Clarke's construction company had performed at the house, whether Clarke himself had personally participated in the work, or whether Clarke in fact had any knowledge of the construction of the house. Furthermore, the Commonwealth offered no testimony that the fire was set in a location that would aid its rapid acceleration.

The situation as to Clarke, at the close of the Commonwealth's case, thus resolved itself into two conflicting theories. On the one hand, the jury might have inferred that Clarke had helped Jacobson start the fire or, perhaps, had gone to Richmond to bolster an alibi in the event Jacobson should be seen in the area. On the other hand, it was equally open, on the Commonwealth's evidence, for the jury to conclude that, while Clarke may have known what was going on, he did not

actively participate in the crime. *Commonwealth* v. *Perry,* 357 Mass. 149, 151 (1970). *Commonwealth* v. *Murphy, supra.* Admittedly, Clarke's conduct gives rise to a great deal of suspicion. But guilt cannot be established by association. See *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965). Cf. *Commonwealth* v. *Shapiro,* 10 Mass. App. Ct. 678, 683-684 (1980). In the circumstances, Clarke was entitled to an acquittal.

We proceed in the remainder of the opinion to discuss Jacobson's other claims of error.

3. *Motion to dismiss the indictment.* Jacobson argues that the indictment should have been dismissed because the prosecutor had deceived the grand jury (a) by presenting evidence of expert test results which showed a gasoline residue in the fluid sample taken from the closet carpets without disclosing that the tests on the carpet samples themselves showed no gasoline residue; and (b) by introducing part of an accountant's report which indicated that Jacobson owed $60,000 in Federal income taxes without introducing another part of the same report which indicated that Jacobson had at least $600,000 in assets on hand with which to pay his tax debt.

All of Trooper Smith's testimony before the grand jury was accurate. A prosecutor is not required to present all possibly exculpatory evidence to a grand jury. *Commonwealth* v. *Connor,* 392 Mass. 838, 854 (1984). See also *Commonwealth* v. *McGahee,* 393 Mass. 743, 746-747 (1985). The test results which were not disclosed were inconclusive and did not contradict the testing done on the fluid sample.[11] Moreover, it is very unlikely that any information which was not disclosed would have affected the grand jury's decision to indict in view of the existence of sufficient other evidence before the grand jury which established that the fire had been set.

---

[11] It was later explained that traces of gasoline in one of the carpet samples could have evaporated because they were stored in large plastic bags prior to being sent to the laboratory. In the case of other samples, which were stored in airtight containers, there was testimony that the carpet's rubber backing could have interfered with the test results.

Nor did the manner in which the prosecutor presented the information contained in a financial report of Jacobson's liabilities provide a basis to dismiss the indictment. On the question of motive, there was testimony before the grand jury concerning the considerable expense and annoyance caused Jacobson by problems at the house and the sizeable increase in the fire insurance coverage. The grand jury also heard testimony from an insurance claims supervisor that, if the dwelling were destroyed, the insurer "would be pretty well at the mercy of the insured and [his] contractors in establishing . . . [a] value [for] the dwelling."[12]

It was in this context that the prosecutor introduced part of an accountant's financial report indicating that Jacobson, at the time of the fire, owed more than $60,000 in Federal income taxes. Jacobson complains that the prosecutor failed to advise the grand jury of a separate part of the report which indicated that he might have had more than $600,000 in cash as of December 31, 1981.[13] Jacobson fails to mention, however, that the omitted portion of the report placed material limitations on Jacobson's cash flow position. Indeed, if the prosecutor had introduced the omitted portion Jacobson might have been prejudiced by conjecture on the part of the grand jurors that he was in legal trouble or had more serious cash flow problems than the evidence depicted. In light of other independent evidence which disclosed to the grand jury that Jacobson was a man

---

[12] Contrary to Jacobson's argument on appeal, the grand jury also heard testimony from Trooper Smith and the insurance claims supervisor that Jacobson had made substantial improvements in the property.

[13] The omitted portion of the report reads as follows:

"3. Assuming a 6/12% interest range and average cash balances throughout the year, Jacobson had cash balances of $612,000/ $1,224,000 as of 12/31/81. This may not be the case, however. Jacobson deducted $41,617 for "legal fees in connection with investment properties" on the 1981 return, yet no new investments appear on the tax return. It is possible that:

"* Jacobson made major investment and cash commitments during the latter part of 1981
                              OR
"* Had serious legal problems which impact on his financial position."

of means, we see nothing in the handling of the report which would impair the integrity of the grand jury proceedings. Cf. *Commonwealth* v. *O'Dell,* 392 Mass. 445, 449 (1984). There is nothing else in Jacobson's other arguments about the handling of the grand jury proceedings which would indicate that the prosecutor had sold "the grand jury 'shoddy merchandise' without appropriate disclaimers." *Commonwealth* v. *Connor,* 392 Mass. at 854. On the whole, the case was fairly presented to the grand jurors and the indictment was well warranted by the evidence before them.

4. *Evidentiary rulings at trial.* (a) *Exclusion of break-in evidence.* The judge excluded business records offered by Jacobson's trial counsel which showed that the security company had gone to the house on two occasions to investigate burglar alarms and had discovered fresh footprints leading into the woods, an unlocked door, and a thermostat set at 80°. Jacobson argues that this evidence was relevant to establish that somebody other than himself had had access to the house and might have committed the arson. The two incidents took place on December 1 and December 7, 1981, more than six weeks before the fire. There was no evidence connecting the events to the fire. There was evidence of an intervening visit to the house by Jacobson, during which he had found nothing wrong. Furthermore, there was evidence that the caretaker had inspected the house the day before the fire and had found everything normal. On the morning of the fire, the fire fighters found no unlocked doors and no footprints in the newly fallen snow.

The trial judge excluded the evidence on the ground of remoteness, concluding that the incidents were too distant from the date of the fire to be relevant. "Whether evidence is legally relevant is a question which is generally left to the discretion of the trial judge . . . . The proximity to the crime in point of time is an element which the judge in his discretion may consider in viewing the probative value of evidence." *Commonwealth* v. *Palmariello,* 392 Mass. 126, 137 (1984), quoting from *Commonwealth* v. *Chasson,* 383 Mass. 183, 187 (1981).

No abuse of discretion in the exclusion of the evidence has been shown.[14]

(b) *Admission of the fluid sample and chemical analysis.* Jacobson argues that the fluid sample taken from the carpeting and its chemical analysis, which disclosed a gasoline residue, should have been excluded because the prosecutor failed to authenticate the sample or to demonstrate an unbroken chain of custody.[15]

The testimony of Troopers Scott and Smith that the fluid sample admitted in evidence was the one squeezed from the carpeting at the house on January 29, 1982, and had not changed in appearance was sufficient to authenticate the sample. See *Commonwealth* v. *LaCorte,* 373 Mass. 700, 704 (1977). Even if we accept Jacobson's arguments that the bottle should have been sealed and that the troopers should have kept better records of its transfer, weaknesses thereby created in the chain of custody would affect only the weight of the evidence, not its admissibility. *Commonwealth* v. *Diaz,* 15 Mass. App. Ct. 469, 473 (1983). The same principle applies to any unexplained time gap in sending the sample to the police laboratory for

---

[14] Jacobson also contends that the evidence of possible burglaries in December, 1981, should have been admitted because the prosecution, in its case in chief, had introduced evidence of a burglary in November, 1981, which had resulted in the loss of more than $22,000 worth of items. Jacobson's trial counsel did not object to the admission of this evidence. The evidence was used for the limited purpose of showing that Jacobson had suffered a string of misfortunes with the house which might have led him to burn it down. There is nothing in the handling of this evidence which required the admission of Jacobson's evidence, particularly in view of the lack of a specific objection to the prosecutor's evidence.

[15] Trooper Scott testified at a voir dire held on Jacobson's objections to the evidence that he had squeezed the liquid from the carpet sample on the day after the fire, clearly labelled the bottle, and placed it on the floor of his evidence locker, which had been kept locked at all times. When the other carpet samples were sent to the laboratory for analysis, the fluid sample was overlooked and remained in Scott's evidence locker until May of 1982. At that time, Scott "cracked" open the cap of the bottle just enough to do a hydrocarbon test, which was positive. He then transferred the bottle to trooper Smith's evidence locker, where it remained until January of 1983. At that time, it was transported to the police laboratory for chemical analysis. Both troopers testified that the fluid had not changed in appearance from the way it had looked the day after the fire.

testing. See *Commonwealth* v. *Baptiste,* 372 Mass. 700, 709 (1977).

5. *Prosecutorial tactics.* Jacobson next claims that the prosecutor's strategy throughout the trial, culminating in his closing argument, unfairly exploited evidence relating to Jacobson's wealth, thereby improperly appealing to possible class prejudices of the jurors. Since no objection was made at trial to any of the matters now complained of, we examine the prosecutor's conduct only to determine whether anything occurred which would create a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967). We find no such risk.

Jacobson concedes that his business interests and financial position were legitimate subjects for examination and discussion before the jury. All the evidence elicited by the prosecutor on those subjects was properly admissible. In particular, evidence that Jacobson had failed to pay his property and income taxes on time was clearly relevant to the prosecutor's theory of Jacobson's motive for burning the house. See *Commonwealth* v. *Haddad,* 250 Mass. 391, 396-397 (1924). Jacobson was free to contradict this evidence by providing the jury with legitimate explanations for his delinquencies. He did so through his own testimony and the testimony of his accountant which established that he had considerable assets and reasons why certain obligations had not been paid on time. We see nothing else in the now criticized portions of the prosecutor's cross-examination of Jacobson and other defense witnesses which could be characterized as unfair. In most cases, the prosecutor's cross-examination was directed primarily to points raised by Jacobson's trial counsel in his direct examination. Finally, in view of the prosecutor's theory of motive, it was not improper for the prosecutor to try to extract an admission from Jacobson that money was very important to him.

Nor do we see anything in the prosecutor's closing argument which would require a new trial. Jacobson's strongest criticism is directed at that part of the prosecutor's closing which urged the jury to find that Jacobson might have a motive for the crime despite his obvious wealth. Read in context, we believe

that the argument was fairly based upon the evidence and the reasonable inferences which could be drawn therefrom. See *Commonwealth* v. *Hoffer,* 375 Mass. 369, 378 (1978). In addition, the remarks were in direct response to comments by Jacobson's trial counsel in his closing argument which urged the jury to find that it made no sense for a man of Jacobson's wealth to burn down his house just to obtain the insurance proceeds. The prosecutor's reply fell within the scope of permissible rebuttal to forceful exposition made in summation by defense counsel. See *Commonwealth* v. *Prendergast,* 385 Mass. 625, 633-634 (1982).

6. *Consciousness of guilt.* It is argued by Jacobson that the judge should not have instructed the jury on the issue of consciousness of guilt.

As previously noted, Jacobson left the scene of the fire and returned to his home in New York despite an express request by a State police officer that he remain at the scene to assist in the investigation of the fire and Jacobson's agreement to do so. Evidence that a person flees from the scene of a crime may be probative of consciousness of guilt, notwithstanding a plausible innocent explanation for the flight. *Commonwealth* v. *Toney,* 385 Mass. 575, 583-585 (1982). It was open to Jacobson to rebut the evidence that he had left the scene, which he did by explaining that he had left at the caretaker's suggestion because he was exhausted and cold. Jacobson also introduced evidence from which the jury could find that he had cooperated in every way with the investigation.

It was for the jury to determine whether Jacobson's flight from the scene reflected consciousness of guilt. *Ibid.* We see no reason to distinguish, in the circumstances, between someone's fleeing the scene to avoid arrest, see *Commonwealth* v. *Toney, supra,* and someone's leaving the scene to avoid investigation. Moreover, the instructions given by the judge on consciousness of guilt fully comported with the requirements of the *Toney* decision.[16] The instructions on the issue were

---

[16] The instructions, among other things, informed the jury that (1) they should not convict Jacobson on the basis of evidence of consciousness of

copious, circumspect, and very fair to Jacobson. We can perceive no error in the judge's handling of the consciousness of guilt evidence.[17]

7. *Jury misconduct.* Jacobson's last argument asserts that the trial judge erred in refusing to grant his motion for a new trial based upon alleged anti-Semitic remarks made by jurors during deliberations. Almost two months after the jury returned their verdicts, Jacobson filed a motion for a new trial supported by affidavits of an alternate juror and one of the deliberating jurors. The alternate juror claimed that she had overheard one of the jurors referring to Jacobson as "a rich New York Jew." The affidavit of the other juror stated that the forelady repeatedly made references to Jacobson as "one of the New York Jews who think they can come up here and get away with anything." She further claimed that other similar anti-Semitic remarks were made by the forelady and other jurors throughout the deliberations.

At Jacobson's request (and over the prosecutor's objection), the judge interviewed each available juror individually, in

guilt alone, and (2) that they could consider such evidence only as a factor possibly tending to prove guilt. The judge also cautioned the jury on the equivocal nature of evidence of flight, explaining that such evidence may be perfectly consistent with innocence, and he expressly refrained, at the request of Jacobson's trial counsel, from drawing the jury's attention to the specific evidence which might constitute consciousness of guilt.

[17] There is an additional argument by Jacobson's appellate counsel that the prosecutor unfairly exceeded the limits set by the judge for closing argument on the issue of consciousness of guilt. No objection was made by Jacobson's trial counsel to the portion of the prosecutor's closing argument which is now claimed to have been improper. The standard for review is the one established in *Commonwealth* v. *Freeman,* 352 Mass. at 564. Looking at the prosecutor's argument in context, it becomes apparent that the prosecutor confined his remarks on the issue, as he was instructed to, to Jacobson's leaving the scene possibly to avoid questioning. The prosecutor's comments on the testimony about Jacobson's misleading statements to hospital personnel in New York were not part of the prosecutor's argument on consciousness of guilt and were proper reply to defense counsel's remarks on the same evidence in his closing. Considering the prosecutor's argument as a whole, and in light of the judge's instructions, see *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 416 (1978), we discern no risk of a miscarriage of justice.

keeping with the procedures set forth in *Commonwealth* v. *Fidler,* 377 Mass. 192, 200-202 (1979).[18] Following his inquiry, the judge made written findings. The judge found that no statement had been made by any of the jurors which would constitute bias and that no conduct or statement by any of the jurors improperly influenced the verdict. On the basis of his findings, the judge denied Jacobson's motion for a new trial.

The record supports the judge's findings. The forelady emphatically denied making any anti-Semitic remarks. In determining whether a juror has been biased, a judge may rely on the testimony of the juror. See *Commonwealth* v. *Coleman,* 389 Mass. 667, 676 n.7 (1983). The other nine deliberating jurors interviewed either flatly denied having heard any anti-Semitic remarks or stated that they could not specifically remember any, but were not sure. The deliberating juror who had submitted the affidavit, upon careful examination by the judge, indicated that the other jurors did not react to the supposed comments by the forelady (except for one juror who made a disgusted face) and that any remarks did not seem to influence anyone. Furthermore, this juror could not remember any specific anti-Semitic remark made by any other juror, even after her memory was refreshed by showing her the inconsistent statements in her affidavit.[19]

Assuming, without deciding, that the judge acted properly in conducting a *Fidler*-type hearing,[20] we find on this record no

---

[18] Two jurors were out of State and could not be interviewed. No one objected to the judge's interviews inquiring of fewer than all of the jurors. Counsel were present during all the interviews.

[19] The judge had instructed the jury that they were to decide the guilt or innocence of the defendants "without prejudice, fear or favor, and solely from a fair consideration of the evidence."

[20] In *Commonwealth* v. *Tavares,* 385 Mass. 140, 155-156 (1982), the Supreme Judicial Court left open the question whether evidence of remarks reflecting racial prejudice during jury deliberations relates to the jurors' mental processes, thus falling outside the scope of the inquiry permitted by *Commonwealth* v. *Fidler, supra.* We need not reach the question here because we agree, based on the judge's findings, that Jacobson has not established that any prejudicial conduct occurred which affected the jury's ability to render a fair and impartial verdict.

reason to order a new trial. The judge's assessment of the situation rested in large part on issues of credibility. In our view, this aspect of the appeal is governed by the following discussion in *Commonwealth* v. *Tavares,* 385 Mass. at 140, 156 (1982), of a claim of racial prejudice infecting a jury's deliberations:

> "The judge interrogated the jurors and concluded that they . . . [had] fairly and impartially render[ed their] verdict. The judge was 'in the best position to judge the weight and credibility of the evidence.' *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977). 'There is no reason to give a judge's finding of fact less weight in [this] . . . context than we ordinarily would, i.e., we accept his finding unless clearly erroneous.' *Commonwealth* v. *Ciminera,* 11 Mass. App. Ct. 101, 109, aff'd, 384 Mass. 807 (1981). '[A] finding of fact by the trial judge will not be deemed "clearly erroneous" unless the reviewing court on the entire evidence is left with the firm conviction that a mistake has been committed.' *New England Canteen Serv., Inc.* v. *Ashley, supra.* Since a review of the entire record has not left us with a firm conviction that a mistake has been committed, the judge's denial of the defendant's motion[ ] is affirmed."[21]

In so deciding, we in no way condone or approve remarks by jurors, entrusted with the grave responsibility of deciding a

---

[21] We see no merit to Jacobson's claim that the judge erred by not telling the jurors who had deliberated the case of the existence of sworn statements by the juror and alternate juror before asking whether they had heard any prejudicial comments. Jacobson's trial counsel urged that this was the only way to counter the jurors' natural human tendency to deny prejudicial misconduct. The judge declined to follow this approach because he did not want to lead the jurors or suggest an answer to them. He did, however, tell the jurors about the affidavits after their initial responses to the questions, to see if the affidavits might refresh their memories. *Fidler* places the responsibility for supervising and directing postverdict interviews of jurors in the judge's discretion. See *Commonwealth* v. *Fidler,* 377 Mass. at 203. We see no abuse of discretion in the method of interviewing used by the judge here.

defendant's liberty, which in any way reflect bias on their part based on the defendant's race, religion, national origin, or personal beliefs.

8. *Conclusion.* As to Clarke, the judgment is reversed, the verdict is set aside, and a required finding of not guilty is to be entered for the defendant. As to Jacobson, the judgment and the order denying the motion for a new trial are both affirmed.

*So ordered.*