COMMONWEALTH *vs.* STEPHEN J. ROBINSON.

Nos. 91-P-1371 & 92-P-1345.

Essex. April 9, 1993. - June 18, 1993.

Present: GILLERMAN. KAPLAN, & GREENBERG, JJ.

*Burning of Property. Practice, Criminal,* New trial. *Constitutional Law,*
   Evidence obtained by private party.

At the trial of an indictment for burning a building, the evidence was suffi-
   cient to warrant the defendant's conviction. [615-617]
Evidence presented in support of a criminal defendant's motion for a new
   trial warranted the judge's denial of the motion. [617-618]
A criminal defendant's motion to suppress evidence given to the police by
   his wife was correctly denied upon the judge's finding that the wife
   acted independently and of her own accord, and not as an agent of the
   police to whom constitutional limits on searches would apply. [618]

INDICTMENT found and returned in the Superior Court De-
partment on December 27, 1989.

A pretrial motion to suppress evidence was heard by *John
J. Irwin, Jr.,* J. The case was heard by *Charles M. Grabau,*
J., and a motion for a new trial was considered by him.

*Judith H. Mizner* for the defendant.

*Elin H. Graydon,* Assistant District Attorney, for the
Commonwealth.

KAPLAN, J. Stephen Robinson was indicted by an Essex
County grand jury for arson of a building (G. L. c. 266, § 2)
and a motor vehicle (G. L. c. 266, § 5). Upon bench trial, he
was convicted of both crimes.[1] The judge denied his motion
for a new trial.

This is a consolidated appeal in which the defendant chal-
lenges the sufficiency of the evidence and also claims error in

---

[1] The motor vehicle conviction was placed on file with the defendant's
consent.

the denial of a new trial. He makes an incidental attack on the denial of his pretrial motion to suppress certain documents.

1. *Sufficiency of the evidence.* The trial transcript is lengthy and there are many exhibits. It will be possible, however, to give a fair account of the case in the form of a condensed statement.

a. *The case.* The victim, Richard Norris, and the defendant, Stephen Robinson, both resided in Rockport with their families. They became acquainted sometime in 1986; their recreational work with a Boy Scout troop — Norris as scoutmaster, the defendant as assistant scoutmaster — brought them together weekly a good part of the year. The defendant and his wife Diane were guests of Norris and his wife Karen at the Norrises' home on Allen Street on perhaps three occasions before the events to be recounted.

By mid-1987, the Robinsons' marriage was unraveling, and it may be that the Norrises' marriage was also faltering. In early evening, June 24, 1987, Norris and Diane Robinson met by prearrangement at an auto dealership in Peabody or Danvers, went to a bar, then to a motel in the Liberty Tree Mall neighborhood in Danvers. They registered and spent time there. Norris and Ms. Robinson spoke by telephone after June 24, and on July 14, again by arrangement, they drove separately to a parking lot in the same Danvers neighborhood. They talked and kissed. At this point the defendant drove up and interrupted the meeting. He spoke very briefly with Norris. They would meet later, the defendant said.

In the days following, Norris and Ms. Robinson discussed by telephone whether they should admit to their affair, and decided against it; they also discussed possible means of securing and destroying evidence — American Express card records of payment — of their sojourn at the motel (nothing came of this). Ms. Robinson found out later that the telephone line at her home on Granite Street had been invaded, presumably by the defendant, and some of her conversations with Norris taped.

Meanwhile, on July 18, 1987, the defendant and Norris met by agreement at a Brigham's sandwich shop in Gloucester. The defendant insisted that Norris tell him the truth about his relations with Ms. Robinson, but Norris was not forthcoming.[2] The defendant said he would make it financially and emotionally difficult for Norris if Norris did not admit to what had happened.

On July 22, 1987, the defendant and Karen Norris met at the same place in Gloucester. He told her about their spouses' affair and the thwarted assignation on July 14.[3]

In early August, 1987, the defendant and Norris had another agreed encounter, this time on the Granite Pier in Rockport. Norris appeared in his antique 1953 Jaguar convertible automobile, a collector's piece which he often drove on weekends; the defendant knew the car and had seen the garage on the Norrises' grounds on Allen Street in which it was kept. At the interview Norris admitted nothing. The defendant said in substance to Norris, "If you ever come near my wife again, I'll kill you."

In February, 1988, the defendant's attorney wrote Norris asserting a claim against him, and in spring, 1988, the attorney commenced a civil action on the defendant's behalf against Norris, charging intentional infliction of emotional distress arising from Norris's affair with the defendant's wife. (This evidently was a plausible substitute for a claim of alienation of affection, a form of action abolished by statute in the Commonwealth.) Damages of $250,000 were claimed. The action was pending at the time of the fire.

At 3:30 A.M. on Thursday, August 18, 1988, fire broke out with an explosion in the Norris garage, burning the Jaguar, the sole car kept there, into charred and melted remains, and largely consuming the two-story garage. The Norrises and

---

[2]The defendant said he had shown a picture of Norris to his young daughter and she had recognized it as the man who visited at the Robinsons' home on Granite Street.

[3]Months later, in March, 1988, Ms. Norris received a letter from the defendant in which he suggested that Norris might be concealing other affairs from her.

their children were in the main house nearby at the time, but they were untouched.

Members of the Rockport fire and police departments suspected that the fire was of incendiary origin. They took a number of items from the fire scene and sent them to the State Department of Public Safety in Boston for analysis; these included a melted-down plastic disc, probably the remnant of a jug, taken from what was left of the driver's compartment of the Jaguar; also some stuffing drawn from the damaged driver's seat. Smell and chromatographic analysis confirmed the presence of gasoline.

Fire and police officers asked Norris on the day whether he knew of anyone who might have set the fire. He named the defendant (and added the name of a certain former employee of the company at which Norris worked). In consequence, on August 19, Sergeant Douglas MacMillin of the Rockport police called the defendant's home, and on August 20, at 10:00 P.M., the defendant came to the police station. He was told he was a suspect and was given Miranda warnings. He said he had left by air on August 16 on a business trip to Orlando, Florida, for his company, Promethean Systems, and had returned by air to Logan Airport in Boston about 8:30 P.M. on August 18. He produced a car rental agreement with a Hertz office in Orlando, an American Express receipt in payment of a hotel bill, and an expense report.

According to Ms. Robinson, the defendant arrived home on Granite Street about 9:30 P.M. on August 18. When told of the fire, he said, "Well, he finally got his due." On August 20, the defendant, according to Ms. Robinson's description, was carrying himself "stiffly." The next morning, unbuttoning a flannel shirt that he had been wearing buttoned to the neck, the defendant revealed burns extending from the left underpart of his chin down his neck and clavicle. Ms. Robinson accompanied him to Addison-Gilbert Hospital. He was treated for second and third degree burns, as well as an abrasion of his right elbow. He said he had suffered the burns on August 19 as the result of a flareup when he tried

to light the propane gas grill at home.[4] He was advised to return the next day for redressing, and did so, and again on August 24.

The difficulties in the Robinson household broke out in a violent episode on October 7, 1989. Ms. Robinson got help from Sergeant MacMillin. A c. 209A restraining order issued against the defendant, and in that connection he spent three days in jail.

Shortly afterward, on October 14, 1989, Ms. Robinson brought copies of certain papers to MacMillin. She had gone through files of the Promethean Systems company covering the relevant period in August, 1988.[5] She found papers showing that the defendant had returned the rented car to Hertz at 6:15 P.M. on August 17, not August 18; also an American Express card receipt dated August 17 for a meal at the Appleton Inn in the Mall neighborhood in Danvers. It appeared further that the defendant's air ticket, noting a Delta flight from Orlando to Boston scheduled to arrive at 8:53 P.M. on August 18, had been overwritten with a number 604 and code indicating that the ticket could have been used on Eastern Airlines. Eastern's flight 604 was scheduled to leave Orlando on weekdays at 7:19 P.M. and arrive in Boston at 10:23 P.M. This allowed for a late meal at the Appleton Inn, some twenty-five minutes by automobile to Rockport.[6] So plenty of time would be left for a criminal event on Allen Street in the early morning of August 18.

Finally, a police expert assigned to the State Fire Marshal's office testified that in his opinion the garage fire had been deliberately set with gasoline as an accelerant, and that its point of origin was the driver's compartment of the Jaguar. Eyewitness testimony about the fire, particularly testimony by Norris, who was at the front of the garage very

---

[4]There was no proof of such an episode beyond the defendant's statement.

[5]The files were kept in the sunroom or porch of the Granite Street house which was serving as the company office.

[6]There was testimony that the regular closing time for the restaurant area at the Inn was 10:00 P.M., but the adjacent lounge area remained open as late as 11:30 P.M.

soon after the explosion, supported this view of the originating point of the fire.

So much for the Commonwealth's case. On the part of the defendant, four witnesses were called. The defendant's son Timothy, sixteen years old at the time of trial, gave testimony about the behavior of the propane gas grill, but it was without particular bearing on occasions that might be relevant. A qualified fire expert testified at length, urging a possibility that the fire might have arisen accidentally, and concluding that the hypothesis of a set fire had not been proved. There was testimony from a couple who occupied a cottage opposite the Norris house. On the night of the fire, they heard a sound that suggested a break-in at the Norris house and the husband called the police; on seeing flames, he called again to change the report. The wife thought she heard footsteps on the pavement beside the cottage. The couple went outside and saw a man, twenty to fifty years of age, a few blocks from the site of the fire. This testimony did not lead anywhere.

b. *Evaluation.* The judge could reasonably and properly arrange the record facts in his mind and evaluate them thus.

First, the judge could accept that it was a set fire. Indeed the analysis by the Commonwealth's expert of the physical remains and the directions and areas of burning could strike the judge as particularly persuasive — more than enough to overcome the doubts expressed by the defendant's expert.

That it was the defendant who set the fire was shown through a confluence of facts. He improved on his earlier suspicions about his wife by tapping the telephone line and following his wife to her tryst with Norris. Knowing to a near certainty that there had been an affair, he was prey to feelings of outrage, resentment, and shame. He insisted that Norris confess and confirm the fact; the confession — self-imposed torture for the defendant to hear it — would be clearest ground to justify acts of retaliation. He made sure that Karen Norris learned of her husband's perfidy, with unpleasant domestic consequences — so he could think — for

the husband. He warned Norris outright that he would bring about financial and emotional troubles.

On the financial side, the defendant fulfilled his prediction by bringing suit in sizable amount. He attacked Norris's emotions by threatening murder, by prompting the notoriety that might attach to the lawsuit, and, in culmination, by setting a fire that centered on the destruction of Norris's cherished possession and conspicuous symbol of status, the antique Jaguar.

At what particular point the defendant's festering imagination overcame his conventional resistance to committing a crime, no one can say. He planned the criminal enterprise with some, but in the end not enough, care. The plan took advantage of the seemingly innocent occasion of a business trip, with the flight ticket showing a return to Boston on the evening of August 18, 1988, as proof that he was secure in Florida at the time of the explosion on Allen Street. The defendant stuck to this scenario in the interview at the police station. In fact, by a shift from the Delta flight to an Eastern flight, the defendant was on home ground during the crucial hours.

The burns he suffered — through no accident with a propane gas grill — escaped detection at the police interview. He lied at the hospital about their origin. But his wife, in attendance there, knew the defendant was perverting the truth, and this probably led her to an inference about the fire.

Nagged by her suspicion about her husband, and embittered by his outburst in October, 1989, Ms. Robinson discovered papers that punctured his attempted alibi and produced a firmer understanding of his movements on August 17-18, 1988.

In colloquies with counsel upon the motion for a required finding of not guilty, the trial judge was scrupulous to consider that the Commonwealth had not fixed definitely the presence of the defendant at the garage around the moment of the fire nor just how the gasoline vapor was activated to explosion. The decided cases recognize, however, that arson-

ists are "furtive criminals," *Commonwealth* v. *Jacobson*, 19 Mass. App. Ct. 666, 674 (1985); see also *Commonwealth* v. *Rhoades*, 379 Mass. 810, 816 (1980), and thus can often be brought to justice only by a "web of circumstantial evidence" that entwines the suspect in guilt beyond a reasonable doubt. See *Commonwealth* v. *Blonde*, 29 Mass. App. Ct. 914, 916 (1990), and cases cited. Eyewitness or other direct evidence is rarely available and the question is whether indirect sources combine to the high degree of probability required for conviction. See *Commonwealth* v. *Bader*, 285 Mass. 574, 577 (1934). Cf. *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). Here, indeed, the defendant is brought by the evidence of his own burns more surely to the scene than were the defendants in many cases of just conviction of arson.

To sum up: the record shows motive for the crime; opportunity to commit it; a likely route to, and evidence of, its commission; and consciousness of guilt in the concocted — and ultimately destroyed — alibi. The judge was right to find the evidence herein to be sufficient to convict; quite clearly so under the rule of the *Latimore* case.[7]

2. *New trial motion.* The defendant moved for a new trial eighteen months after his conviction. His counsel offered proof that the defendant's car, parked at Logan Airport on August 16, 1988, was retrieved on August 18 at 6:40 P.M.[8] Also tendered was an affidavit by an employee of Eastern Airlines, a company now in liquidation. On the basis, as he

---

[7] Considering, on a motion for a required finding of not guilty, "only the evidence introduced up to the time that the Commonwealth rested its case," *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976), the judge is to decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979).

The situation here was in substance the same when the motion was renewed at the close of all the evidence, for the Commonwealth's case had not "deteriorated." See *Kelley*, 370 Mass. at 150 n.1; *Commonwealth* v. *Hastings*, 22 Mass. App. Ct. 930, 931 (1986), and cases cited.

[8] Strictly, the parking receipt was not new evidence as it was on hand at the time of trial, although not offered in evidence.

indicated, of reading remaining records of the company (not exhibited with the motion), this employee concluded that flight 604 was delayed, and had arrived at Logan at 12:03 A.M. on August 18.

The evidence to reopen the case was not at all formidable. If taken at face value, it would bring the defendant to Boston still with time to get to Rockport and set the fire around 3:30 A.M. So the judge noted.

Actually, accepting the evidence, we can see a rounded picture emerge that is fatal to the defendant. Defendant's counsel had suggested at trial that the date stamped on the Appleton Inn receipt was wrong: the night auditor at the Inn was charged with changing daily the date on the stamping device; he did this by hand, and there may have been a slip. Suppose the date on the defendant's receipt should have been August 18. Then we have the defendant reaching Boston just past midnight on August 18; he heads to Rockport probably by rented car, and commits the crime, returns to Logan to retrieve his own parked car, drives to the Appleton Inn in Danvers and has a meal there, receiving his misdated receipt, and turns up at home around 9:30 P.M., August 18.

3. *Suppression motion.* The motion to suppress the papers found by Ms. Robinson rested on the claim that she had become an agent of the police, and so of the State, to whom constitutional limits on searches would apply. The judge said, correctly, that Ms. Robinson "acted independently and of her own accord." Cf. *Commonwealth* v. *Mahnke,* 368 Mass. 662, 677-678 (1975), cert. denied, 425 U.S. 959 (1976). Consistent with this finding is an assumption that Ms. Robinson wanted to assist the police. Cf. *Commonwealth* v. *Rancourt,* 399 Mass. 269, 273-275 (1987). In fact the police were careful to avoid any reproach that they gave explicit direction to Ms. Robinson or subtly connived with her.

*Judgment affirmed.*
*Order denying motion for new*
*trial affirmed.*