COMMONWEALTH *vs.* SHAUN MCKAY.

No. 99-P-371.

Worcester. September 7, 2000. - December 21, 2000.

Present: BROWN, GREENBERG, & DUFFLY, JJ.

*Breaking and Entering. Larceny. Evidence,* Joint enterprise. *Joint Enterprise.*

Evidence, consisting mainly of the defendant's statement to police, at the trial on a joint venture theory of complaints for breaking and entering a building in the daytime with intent to commit a felony and related crimes, was insufficient to establish more than the defendant's mere presence near the scene of a crime, and the defendant was entitled to a finding of not guilty. [606-608] BROWN, J., dissenting.

COMPLAINT received and sworn to in the East Brookfield Division of the District Court Department on July 29, 1998.

The case was tried before *Paul F. LoConto,* J.

*Aziz Safar* for the defendant.

*Sandra P. Wysocki Capplis,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. On the afternoon of July 27, 1998, Kevin Disley broke into the Kaczmarski residence located at the end of Prospect Street in Gilbertville, a remote section of the town of Hardwick. The following morning Disley was charged with the burglary. On the same day, the defendant, Shaun McKay, seventeen and homeless, heard about the police investigation and voluntarily gave a statement to Hardwick police Officer Thomas A. Petrone, who taped the interview.

Disley and the defendant were both charged with breaking and entering a building in the daytime with intent to commit a felony (G. L. c. 266, § 18); larceny in a building (G. L. c. 266, § 20); malicious destruction of property over $250 (G. L. c. 266, § 127); and larceny of property over $250 (G. L. c. 266, § 30). The Commonwealth proceeded separately against the defendant as a joint venturer with respect to all charges. A jury of six in

the District Court convicted the defendant of breaking and entering and larceny in a building.[1] On appeal, the defendant claims that the Commonwealth failed to prove that he was a joint venturer.

The Commonwealth's proof of the defendant's participation in the crime primarily came from Officer Petrone's tape recorded interview of the defendant after he had been given Miranda warnings, but before he was taken into custody, and from the defendant's written statement drafted in the course of that interview. We summarize the pertinent portions of the interview and the statement as well as portions of Petrone's trial testimony.

Before drafting the statement, the defendant stated that during the morning of July 27, 1998, he and Disley walked up to the end of Prospect Street (a dead end street) toward the Kaczmarski residence and then into the woods and that Disley had a "blue backpack" with him. The defendant stated that "at that time" he did not know why they went to the woods. Disley told him to "[s]tay [in the woods] for a few minutes." Disley proceeded to the back side of the house and to a sliding glass door. Disley had the backpack with him, but the defendant was not aware that he had any tools, such as "screwdrivers, hammers, [or] wrenches," and he did not see Disley take anything out of the bag to force the sliding door open. Disley was in the house for about five minutes. While he was gone, the defendant heard barking dogs. Disley exited from a different door and returned to the woods. He asked the defendant if he had heard the dogs, to which the defendant responded, "Yeah." Disley answered, "All right." Disley had the backpack with him, but did not open it. He told the defendant to "hold on a second" and that he would be right back. Disley took the backpack with him and entered the house a second time through the cellar. Disley came out of the cellar door about three minutes later and returned to the woods. Disley left the backpack in the woods, and they both took off down Prospect Street. Disley told the defendant that Gregory Kaczmarski was not home. The defendant went to a tractor-trailer across from the American Legion where he was staying at the time. Disley went to a friend's house.

After the defendant completed his written statement, the

---

[1] Larceny of property over $250 was dismissed. There was a not guilty verdict on the malicious distribution of property over $250 charge.

interview resumed. The defendant stated that Disley might have had something in the backpack "the way it was bulging." The defendant was shown a picture of other items (apparently taken from the house) that were recovered by the police, and he stated that he did not know how they got there, surmising that Disley might have returned on his own after he and Disley had departed. The defendant stated that, when Disley came out of the house the second time, he was carrying a blue duffel bag,[2] which appeared to be empty, over his shoulder and that Disley left the duffel bag with the backpack when they departed. Asked whether he had told anyone what he had done, the defendant responded that he "didn't think anybody needed to know." Petrone told the defendant, "I can't promise you any leniency or any special favors or anything like that," and the defendant replied that he understood. The defendant also indicated that he understood what the crimes were (Petrone mentioned to him "breaking and entering in the daytime").

Officer Petrone testified that there was a tree line about 175-200 feet from the rear of the residence and that the stolen items were recovered about twenty to thirty feet from the house in a small clearing. Petrone stated that, from the tree line above the rear of the residence, one could "see all the way down to the bottom of Prospect Street" and observe any vehicles making their way up the street.

The Commonwealth proceeded on a theory that the defendant acted as a lookout. "[A] person who acts as a lookout while others are engaged in a criminal enterprise can be convicted on a joint enterprise theory." *Commonwealth* v. *Ward*, 45 Mass. App. Ct. 901, 902 (1998), quoting from *Commonwealth* v. *James*, 30 Mass. App. Ct. 490, 499 n.10 (1991). However, "for the Commonwealth to withstand a motion for a required finding of not guilty, it cannot rely on evidence that merely places the defendant at the scene of the crime and shows him to be in association with the principals." *Commonwealth* v. *Saez*, 21 Mass. App. Ct. 408, 411 (1986). See *Commonwealth* v. *Pringle*, 22 Mass. App. Ct. 746, 749 (1986). "Rather, the Commonwealth must present additional evidence which implicates the defendant in the crime." *Commonwealth* v. *Fuentes*, 45 Mass. App. Ct. 934, 935 (1998).

There is a serious deficiency in the Commonwealth's proof

[2]The homeowner, Cheryl Kaczmarski, testified that a blue duffel bag that she had left on a chair was missing.

on the complaint charging the defendant with both crimes of which he was convicted as a joint venturer. We do not consider the defendant's observation of the backpack or the response to Disley's question about the barking dogs as sufficient evidence either to constitute advance knowledge of Disley's plan or otherwise to signify participation as a joint venturer. As a result, there is a paucity of evidence that the defendant was acting as a "lookout." See *Commonwealth* v. *Ward*, 45 Mass. App. Ct. at 902.

The Commonwealth argues that proof of the defendant's association with the criminal venture rests upon his standing behind a tree line in the woods at the rear which commanded a view of anyone approaching the house from Prospect Street. See, e.g., *Commonwealth* v. *Fuentes*, 45 Mass. App. Ct. at 935. However, in relying on the defendant's unusual or uncommon position in relationship to the house as an indication of his complicity, the Commonwealth overlooks the defendant's recorded statement to Officer Petrone that he stayed in the woods rather than on the street because he and Gregory Kaczmarski did not get along. There is nothing in the defendant's responses to Petrone's questions that reveals that the defendant had actual knowledge that Disley was going inside the house to steal property. Compare *Commonwealth* v. *Jacobson*, 19 Mass. App. Ct. 666 (1985), where the codefendant Clarke was charged with acting as a lookout while Jacobson set fire to a residence. There we wrestled with the same question. *Id.* at 674-676. While we thought Clarke's conduct gave rise "to a great deal of suspicion," there was nothing more to the Commonwealth's case than his presence at or near the scene of the crime. *Id.* at 676.

Similarly, in the *Saez* case, the defendant was charged with possession of heroin with intent to distribute under a theory of joint venture. 21 Mass. App. Ct. 408. A rundown of factors mentioned there supports our conclusion in this case. The principal evidence of Saez's participation as a dealer was that on two separate occasions he looked up and down the street where the transaction took place. *Id.* at 411. Nothing in the record indicated that there was communication between the defendant and the principal who actually sold the heroin. *Id.* at 412. Based on the failure of the Commonwealth to develop facts more accurately, too much was left to conjecture and surmise. Cases (which deal with stronger circumstantial

evidence) relied on by the Commonwealth on the participation aspect of the case do not seem inconsistent with our conclusion here.

In the *Fuentes* case, for example, the defendant was walking past an apartment building when he encountered five other men with whom he was acquainted. 45 Mass. App. Ct. at 934. One of the men told the defendant to watch out for police, and in response he stood outside the building looking up and down the street. *Ibid.* The other men then set fire to the building and then ran out screaming. Four days after the arson, a witness was threatened by the defendant for "snitching" on him. *Ibid.* Based on the corroborative testimony, the trial judge denied the defendant's motion for a directed verdict. The *Fuentes* court acknowledged that the evidence of the defendant's covert head movements would not have been enough, standing alone, to convict him. *Id.* at 935. However, that evidence, taken with the evidence that he was asked by a confederate to serve as "lookout," his threats to a potential adverse witness, and his immediate flight from the scene with the arsonists, all "combine[d] to form a fabric of proof that was sufficient to warrant the jury's finding [of guilt] beyond a reasonable doubt." *Id.* at 936. By comparison, the defendant's statements to Disley, as set forth in the defendant's taped interview with Officer Petrone, which were not spontaneous but were elicited by Disley's questions, provided no information from which the jury could infer that he agreed to keep watch. Although he was standing to the rear of the house, he did not engage in any incriminating pre- or post-crime behavior.

The same is true of *Commonwealth* v. *Mendes*, 46 Mass. App. Ct. 581 (1999), which the Commonwealth cites for support. In that case, the defendant was convicted of possession of cocaine and possession of a firearm on the basis that he was a joint venturer. To crack down on illegal gun trading, the United States Treasury Department's Bureau of Alcohol, Tobacco, and Firearms (ATF) set up a sting operation targeting one Perdoza, a known drug and arms dealer. The undercover ATF agent set up a meeting in a hotel room with Perdoza, communicating through various telephone calls and by leaving coded messages on a pager. Perdoza agreed to meet the agent and stated that he would be bringing someone with him. Upon arrival at the hotel, the undercover officers noted that Perdoza was with two other men, one of them being the defendant. The defendant took the eleva-

tor to the ninth floor with the two cohorts, remaining in the hallway while the two men went into the hotel room. The defendant then paced the hallway outside of the room for approximately five minutes, before going to a public restroom on the second floor. The officers stopped the defendant outside the restroom and conducted a pat search, discovering that the defendant had in his possession the pager that displayed the undercover officer's coded message. At the same time that the defendant was being searched, the other participants were exchanging two bags of cocaine for three handguns.

In that case, we concluded that the evidence was sufficient to support the inference that the defendant was acting as a lookout, e.g., the defendant paced the hall right outside the door for five minutes, had possession of the pager which had been used to set up the transaction and on which he could be paged if the other two men needed assistance, and there were three guns purchased, presumably one for each of the men involved in the drug trade. *Id.* at 588-589. As with other similar cases, we noted that standing outside the door was not enough alone to convict the defendant, but additional evidence made it possible to infer that "the defendant's role in the joint enterprise was to act as a lookout." *Id.* at 589. The *Mendes* case reminds us that conviction under the joint venture theory cannot be based on "guilt by association." *Commonwealth* v. *Borans*, 379 Mass. 117, 148 n.29 (1979). The defendant needs to have agreed to participate and take some action in a meaningful way. *Commonwealth* v. *Springer*, 49 Mass. App. Ct. 469, 472-474 (2000).

*Judgment reversed.*

*Verdict set aside.*

*Judgment for defendant.*

BROWN, J. (dissenting). The defendant maintains that the Commonwealth did not prove beyond a reasonable doubt that he was engaged in a joint venture with Kevin Disley. In that context, the only question that requires serious attention is whether the defendant "acted with knowledge of the . . . robbery and an intent to assist in committing the crime." *Commonwealth* v. *Giang*, 402 Mass. 604, 608 (1988). See *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 241-242 (1982).

Although the evidence is not overwhelming, I think the jury could infer, beyond a reasonable doubt, that the defendant had advance knowledge of what Disley was going to do,[1] and that he stood by ready to assist Disley if necessary by remaining in a tree line above the rear of the residence as a lookout, inferably listening for sounds[2] while Disley twice entered the house, on one occasion returning with a "bulging" bag, and subsequently departing with Disley. Compare *Commonwealth* v. *Fuentes*, 45 Mass. App. Ct. 934, 935-936 (1998). Contrast *Commonwealth* v. *Lombard*, 419 Mass. 585, 590 (1995). "[I]f one is, by agreement, in a position to render aid, he is an abettor even if he does not participate in the actual perpetration of the crime . . . ." *Commonwealth* v. *Costa*, 407 Mass. 216, 224-225 (1990). See *Commonwealth* v. *Conroy*, 333 Mass. 751, 755 (1956); *Commonwealth* v. *Lafayette*, 40 Mass. App. Ct. 534, 537 (1996). See also *Commonwealth* v. *Caramanica*, 49 Mass. App. Ct. 376, 381 (2000), and cases cited therein. The evidence, and reasonable inferences drawn therefrom, as to participation as a joint venturer, need not be compelling, only permissible. *Commonwealth* v. *Murphy*, 31 Mass. App. Ct. 901, 903 (1991). Here, "the jury could believe a part and disbelieve a part of the defendant's statements without distorting or mutilating any integral portion of the statements." *Commonwealth* v. *McInerney*, 373 Mass. 136, 144 (1977). With this in mind, I conclude that there was sufficient evidence that the defendant actively participated as a lookout to take the case to the jury. See *Commonwealth* v. *Mendes*, 46 Mass. App. Ct. 581, 588-589 (1999). See also *Commonwealth* v. *Pringle*, 22 Mass. App. Ct. 746, 750 (1986); *Commonwealth* v. *Fuentes*, 45 Mass. App. Ct. at 935-936.

---

[1] Indeed, upon a careful reading, I would characterize the defendant's recorded statements to the police as redolent of his knowledge of the mischief afoot, recognizing, however, that presence and knowledge, without more, are not enough to establish joint venture liability.

[2] I am hard pressed to fathom any innocent basis for Disley's inquiry (between entries into the house) to the defendant whether "he heard a dog [or dogs] barking."