COMMONWEALTH vs. SALAHUDDIN ALI
(and two companion cases[1]).

No. 96-P-727.

Barnstable. June 4, 1997. - September 26, 1997.

Present: WARNER, C.J., JACOBS, & LENK, JJ.

*Grand Jury. Practice, Criminal,* Grand jury proceedings, Voir dire, Examination of jurors, Severance, Assistance of counsel. *Evidence,* Exculpatory, Hearsay, Fingerprints, Relevancy and materiality. *Jury and Jurors. Joint Enterprise.*

In a criminal case, the defendant did not demonstrate that certain allegedly exculpatory evidence that was not presented to the grand jury greatly undermined the credibility of evidence likely to have affected the grand jury's decision to indict [556-557], nor did the defendant demonstrate that hearsay testimony and a reference to the defendant's criminal record presented to the grand jury probably made a difference in the jurors' decision to indict [557-558]; the defendant was not entitled to dismissal of the indictment on the ground that the integrity of the grand jury had thereby been impaired.

A defendant in a criminal case did not demonstrate that there was a substantial risk of an extraneous influence on prospective jurors that required the judge to conduct individual voir dire of the venire. [558-560]

Certain hearsay statements of a criminal defendant were properly admitted against two codefendants at their joint trial, where sufficient evidence had been presented to show that they were engaged in a joint venture [560-562], and there was no violation of one codefendant's right of confrontation by the judge's denial of a motion to sever his case based on the prospective admission of those statements [562].

At the trial of a criminal case, the judge's instructions concerning fingerprints of one codefendant found on a fake gun left at the scene of a robbery were adequate. [562-563]

At a criminal trial, defense counsel's failure to object to relevant and not unfairly prejudicial evidence did not constitute ineffective assistance of counsel. [563-564]

At a criminal trial, the judge properly exercised his discretion in questioning the jurors collectively whether they had read a certain newspaper article, and an individual voir dire of the panel was not required. [564-565]

INDICTMENTS found and returned in the Superior Court Department on January 3, 1994.

---

[1]The companion cases are against Myles Miranda and Anthony J. Rose, Jr.

The cases were tried before *Herbert F. Travers, Jr.*, J.

*Carlo Obligato* for Salahuddin Ali.

*Richard N. Foley* for Anthony J. Rose, Jr.

*James H. Budreau* for Myles P. Miranda.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

WARNER, C.J. Salahuddin Ali, Myles Miranda, and Anthony J. Rose were convicted by a jury of armed robbery while masked. Ali and Miranda received life terms at the Massachusetts Correctional Institution at Cedar Junction (M.C.I., Cedar Junction), Ali's term to be served from and after any sentence presently being served. Rose received a sentence of from twelve to eighteen years at M.C.I., Cedar Junction.

The defendants raise the following issues on appeal: (1) whether the grand jury proceedings were tainted because the prosecution failed to present exculpatory evidence and presented inadmissible prejudicial evidence; (2) whether the trial judge should have asked the prospective jury venire if they had heard a statement made by another prospective juror; (3) whether the trial judge erred in admitting Miranda's hearsay statements implicating Ali and Rose; (4) whether Rose's motion to sever should have been allowed[2]; (5) whether the trial judge failed to instruct the jury correctly concerning evidence of Ali's fingerprints; (6) whether defense counsel's failure to object to the introduction of certain evidence against Miranda constituted ineffective assistance; (7) whether the trial judge made a proper inquiry of the jurors regarding their exposure to trial publicity. We affirm the convictions.

The jury could have found the following facts. Further details will be discussed in conjunction with the relevant issues.

*The robbery.* On September 25, 1993, at approximately 10:30 in the morning, a noisy red-orange dirt bike approached the Plymouth Savings Bank in Cotuit. The driver was dressed in black and wore a full-faced red motorcycle helmet which left only his eyes showing. A passenger, also dressed in black and wearing black gloves, dismounted, rolled down a black ski mask, pulled out what appeared to be a gun, and entered the bank. The dirt bike circled outside.

---

[2]Ali moved to sever as well, but moved in the alternative to have incriminating extrajudicial statements of nontestifying codefendants sanitized in order to delete references to himself. On appeal, he challenges only the trial judge's rulings regarding the introduction of extrajudicial statements against him.

Inside, the robber brandished the "gun," described by eyewitnesses as a black and silver colored automatic, ordered everyone to the floor, vaulted the counter, and told the bank's manager to empty the cash drawers into a bag he produced. He then ordered the manager onto the floor, and went into her office, where a window was later found broken.[3] He left the bank through the front door and escaped on the dirt bike. The thieves got away with approximately $5,900. Another $530 was recovered inside the bank and outside the broken window of the manager's office.

A knife and a lighter in the shape of an automatic handgun were found on the floor of the bank manager's office. Three pieces of black electrical tape were attached to the gun shaped lighter. Once the tape was removed and the cover opened, two fingerprints were recovered, one each on the left and right sides of the barrel. They matched the prints on Ali's left thumb and index finger. The dirt bike was recovered within an hour of the robbery in a densely wooded, unpaved area approximately fifty yards from the Cotuit water tower. Tire tracks were found nearby.

Eleven eyewitnesses, some of whom caught only short glimpses of the robbers, testified. None could make a positive identification. Only one witness, who was in the bank's parking lot when the thieves arrived, saw the face of the robber who entered the bank before he pulled down his mask. She testified that he was black, about five feet six or seven, seventeen or nineteen years old, slender, with black hair. She further testified that the driver, also black, had very dark, almond shaped eyes, and was also young.

Several other witnesses estimated that the thief who entered the bank was between five feet five and five feet nine, and of stocky build. The robbers were described as agile, and from this two witnesses concluded that they were young.[4]

---

[3]A bank security officer testified that the bank's exploding dye-pack security system could be avoided by breaking a window not armed with a sensor and throwing the bag of money out, rather than taking the money out through the front door.

[4]Witness accounts varied somewhat. One, who saw the driver only in a sitting position, guessed that he was six feet tall. Another, who saw the robber running out of the bank, thought he was slender and five feet three inches tall. Two witnesses thought he was white solely because his voice had no "accent."

Ali was thirty-five years old at the time of the robbery. According to the arresting officer, Ali's height is between five feet six and five feet nine, and his

During the robbery, the bank manager had withdrawn cash from a drawer containing "bait money" which activated an alarm when removed. Covering the bait money were thirty-six two dollar bills, a denomination ordinarily disbursed only upon request. Ali was seen carrying seven or eight two dollar bills within two weeks of the robbery.

*Events preceding the robbery.* On September 10, 1993, approximately two weeks before the robbery, Miranda moved into a house in Marstons Mills with Lori Klein, the Commonwealth's major witness, and her teen-aged son, Brian Mederois. Several days later, Rose brought over a green dirt bike, which was kept in the basement. Brian heard Rose say that he had stolen it. The bike broke down, and Rose's younger brother, Manny Lopes tried to help fix it. During this period, according to Klein, Ali came to the house approximately a dozen times and Rose even more frequently. Klein and Brian were frequently admonished to stay out of the basement while the men were there. Klein testifed that all three defendants were present during two or three of the half dozen times she was told to stay out of the basement; Rose, Miranda, and Manny Lopes were there on the other occasions.

According to Brian, Manny Lopes brought a red bike to the house several days before the robbery.[5] When Klein went down to the basement during this period, she saw the green bike, which had been taken apart, along with tools and black work gloves. She also saw the red-orange dirt bike which she later recognized in a newspaper photograph as the bike that had been used in the bank robbery.[6]

Klein saw Rose driving the red-orange dirt bike approximately ten times, wearing a full-faced red motorcyle helmet. On the Thursday before the Saturday robbery, Ali and Miranda drove off in Klein's car. Rose tried to start the dirt bike, but had to change a spark plug and left about ten minutes after Ali and Miranda. He appeared anxious, and asked Klein how much time had elapsed since the others had left.

weight, one hundred seventy-five pounds; Rose's height, five feet nine, and his weight one hundred fifty pounds.

[5]The dirt bike apparently had red and orange tones, and was described by various witnesses as red, red-orange, and orange.

[6]Paul Mardirosian's dirt bike was stolen from his front yard, where it had been offered for sale on September 23. He later identified the bike abandoned near the Cotuit water tower after the robbery as his stolen bike.

A day or two before the robbery, probably Friday, at dusk, Miranda's neighbor saw a motorcycle drive out of Miranda's lot. The driver was black, and, therefore, not Klein's son, Brian. The neighbor then saw Miranda drive down the road in Klein's car, a silver gray Nissan. He asked Miranda which way the motorcycle was going, since he was going horseback riding and wanted to avoid it. Miranda told him that they "were just going for a ride."

That Friday evening, at about five o'clock or earlier, Melvin Dishman, who was riding his dirt bike under the Cotuit power lines, saw a dirt bike on the same trail. He recognized it as the bike he had seen offered for sale at Paul Mardirosian's house. The rider was thin and wore a full-faced helmet. A silver compact car was parked on the trail underneath the water tower, an area where it was unusual to see an automobile. Miranda was leaning on the car. After the robbery, Dishman saw a newspaper photograph of the bike used in the robbery and recognized it as the bike he had seen that night.

Miranda and Rose returned to Miranda's home that evening, then left again with Klein to go to the home of Rose's girlfriend, Cheryl Gomes, in South Dennis, where Rose frequently spent the night. En route, they stopped at a Radio Shack store in Hyannis where Rose stole two sets of headphones with speakers on them. Rose and Miranda then stole batteries for the headphones at a pharmacy. They tested the headphones during the remainder of the trip to see if sounds were clear and to ascertain whether conversations could be picked up on the car radio. On certain roads, Miranda drove with the headlights off.

At Gomes's house, Miranda and Rose got out of the car and continued testing the headphones to ascertain the range from which they could hear each other. After a while, they decided that the range was insufficient. They left the headphones in the trunk of Klein's car, and she eventually turned them over to the Barnstable police.

Klein, Miranda, Rose, and Gomes went to a local bar that evening. Gomes and Klein testified that Miranda and Rose argued because Rose wanted to remain in Dennis with Gomes, while Miranda wanted him to return with them to Marstons Mills. Miranda was upset with Rose and told him not to stay the night because they had something to do that morning with Ali, they had to be up early, and Ali would be angry. Miranda said they were meeting at approximately seven o'clock, and

Rose said that he would be up early. Rose and Gomes were dropped off at Gomes's apartment. A telephone call was made from the Gomes residence to the Ali residence at nine-fifty that evening. Klein testified that after she and Miranda returned home, Miranda telephoned Rose between eleven-thirty and twelve-thirty.[7]

At six-seventeen the next morning, the day of the robbery, the Miranda residence received a call from the Ali residence. Miranda got up, dressed, and, Klein testified, telephoned Rose.[8] Miranda, who ordinarily got up at noon, left shortly after the phone calls. Klein did not see him until close to noon.[9]

Rose left Gomes's house at approximately six-thirty the morning of the robbery, dressed in a black sweatshirt and jeans, and told Gomes he had to meet a cousin. Both Miranda and Ali are Rose's cousins. Klein testified that she saw Rose at her house a number of times that day, the first time before eleven-thirty in the morning. She heard the dirt bike running that morning.

*Events following the robbery.* Rose returned to Gomes's house at approximately twelve-thirty in the afternoon wearing different clothing. He told Gomes that he had left the clothes he had worn earlier at Miranda's house. Klein testified that Rose left a black, hooded sweatshirt there.

Miranda, who had no money the week before the robbery, returned home the day of the robbery with two new pairs of sneakers and two packages of socks. That afternoon he and Klein went to a liquor store, where he spent between eighty and one hundred dollars. Miranda then bought four new tires for Klein's car. He took the old tires with him, saying that he didn't want to pay the disposal fee, which amounted to four dollars. He threw the old tires into the woods.

The next day Klein and Miranda went to a local mall. Klein, who had rarely seen Miranda with one or two hundred dollars before, estimated that he was carrying seven hundred dollars. He paid cash for outfits for himself and Klein, put down sixty

[7]Telephone records show that this call was made at 12:48 A.M.

[8]Telephone records show that this call was made at 6:17 A.M.

[9]Eleven telephone calls were made from the Miranda residence to the Gomes residence between September 21 and September 25. Between September 21 and September 29, three calls were made from the Gomes residence to the Miranda residence and nine from the Gomes residence to the Ali residence.

dollars for a men's diamond ring,[10] and filled out a lay-away application claiming to be self-employed and earning fifteen hundred dollars a week, although he was not working at the time. He further told a jewelry store employee that he banked with the Plymouth Savings Bank.[11] Miranda also repaid one hundred forty dollars that he had borrowed from Brian.

Before going to the mall, Klein saw, in that day's Cape Cod Times, a photograph of the dirt bike that had been in her basement. She talked with Miranda about it. He told her to read the newspaper article, but not to show it to her son. Miranda then said, "You might as well hear it from me, I was waiting at the water tower. I was not in any bank." He told her that Rose and Ali had been at the bank and that he had waited for them at the water tower. Klein asked what would happen if her son saw the article and the picture of the dirt bike, and Miranda told her they would tell him not to say anything except that the bike belonged to a friend down the street. He further told Klein not to drive her car in the Cotuit area for a couple of weeks.

After returning from the mall, Klein and Miranda went to Gomes's house. Rose was there, and Ali arrived later with his girlfriend. Klein asked Ali, in a whisper, whether he had seen the newspaper. Ali said that he had not, and Klein told him that there was a picture of the dirt bike on the front page. Without replying, Ali went with Rose and Miranda to Klein's car, where a copy of the newspaper had been left.

When Klein and Miranda returned home, they told Brian about the newspaper photograph of the dirt bike. They admonished him not to tell anyone that they had had a dirt bike, but that if he were asked about it, to say that it belonged to a friend down the street.

Klein further testified that after the robbery Miranda told Rose to get over to the house, finish up his end of the bargain, and get things picked up.[12] The basement was cleaned up at some point, and the parts of the green bike were removed. The

[10]The testimony of a jewelry store employee regarding the ring was limited to Miranda's case.

[11]The bank manager testified that she checked the bank's computer system to ascertain whether Miranda was a customer of the bank on September 25, 1993. His name did not appear in the computer, and she concluded that he was not a customer of the bank.

[12]The testimony regarding this conversation was limited to Miranda's case at trial.

Monday after the robbery, Miranda raked over dirt bike tracks in the back yard.

Numerous telephone calls, some lengthy, were made among the codefendants' residences between the date of the robbery, September 25, and September 29.[18]

1. *The grand jury proceedings.* Miranda, who was indicted together with Rose and Ali, claims that the Commonwealth withheld exculpatory evidence and presented prejudicial evidence which would have been inadmissible at trial, impairing the integrity of the grand jury proceedings and requiring dismissal of the indictment against him. Prior to trial, Miranda moved to have his indictment dismissed on the ground that the Commonwealth knowingly failed to inform the grand jury that Lori Klein, the Commonwealth's prime witness, had initially denied knowledge of the robbery. The motion was denied. Miranda's other claims of impairment are raised for the first time on appeal, and will be reviewed to determine whether they raise a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Tavares*, 27 Mass. App. Ct. 637, 638-639 (1989).

A court will not ordinarily review the competency or sufficiency of evidence before a grand jury, *Commonwealth* v. *O'Dell*, 392 Mass. 445, 450 (1984), but will do so when the defendant claims that the integrity of the grand jury has been impaired. *Commonwealth* v. *Freeman*, 407 Mass. 279, 282 (1990), and cases cited. No comprehensive rule delineates what constitutes impairment of the grand jury process. *Commonwealth* v. *Pond*, 24 Mass. App. Ct. 546, 550 (1987). "To support a claim that the integrity of the grand jury proceedings has been impaired, the evidence (1) must have been given with the knowledge that it was false or deceptive, (2) must have been given with the intention of obtaining the indictment, and (3) must probably have influenced the grand jury's determina-

---

[18]Sixteen telephone calls were made from the Miranda residence to the Gomes residence and six from the Ali residence to the Gomes residence between September 26 and September 29.

Lengthy calls made between September 25 and September 29 included: an eight minute call from the Miranda residence to the Gomes residence on September 27; a twenty-one minute call from the Ali residence to the Gomes residence on September 28; a twenty-three minute call from the Miranda residence to the Gomes residence that same day; a forty-one minute call from the Miranda residence to the Gomes residence on September 29; a thirty-one minute call from the Ali residence to the Gomes residence that same day.

tion to hand up the indictment." *Id.* at 551. The defendant has the burden of demonstrating these factors. *Ibid.*

a. *Exculpatory evidence.* Miranda contends that Detective John Murphy, Jr., the officer who investigated the bank robbery, wrongly withheld two pieces of exculpatory evidence during his grand jury testimony. First, he testified about interviews with prosecution witness Lori Klein beginning on November 25, 1993, when she told him that the three defendants were responsible for the bank robbery. He did not mention that he had spoken with her earlier, on October 21, at which time she denied knowing about the robbery. Second, he did not mention that Klein appeared intoxicated on November 25, the first of four consecutive days she spoke with him.

A prosecutor is not required to present all exculpatory evidence to a grand jury, but "must disclose evidence that would 'greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict.' " *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 753 (1995), quoting from *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985). See *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984). Miranda has not shown that these omissions were likely to have so affected the grand jury. In fact, subsequent events indicate that this evidence was unlikely to have affected their decision. At trial, the petit jury heard the evidence at issue and found Miranda guilty beyond a reasonable doubt. "It would be rational to assume, therefore, that a failure to disclose the same evidence to a grand jury seeking only *probable cause* would have a negligible effect on their decision to indict" (emphasis in original). *Commonwealth*v. *Trowbridge*, 419 Mass. at 754, quoting from *Commonwealth* v. *LaVelle*, 414 Mass. 146, 151 n.2 (1993). See *Commonwealth* v. *Tanso*, 411 Mass. 640, 655, cert. denied, 505 U.S. 1221 (1992) (important witness's allegedly inconsistent statement did not greatly undermine his credibility).

b. *Inadmissible evidence.* Miranda argues that testimony concerning his codefendant Rose's post-conspiracy confession to a friend, which implicated Miranda, unfairly prejudiced him. While this testimony would have been inadmissible at trial, hearsay is permissible during grand jury proceedings. See *Commonwealth* v. *Gibson*, 368 Mass. 518, 522-525 (1975); *Commonwealth* v. *Pond*, 24 Mass. App. Ct. at 552. Moreover, the testimony of which Miranda complains constituted only a small portion of the inculpatory evidence presented to the grand jury.

Miranda also argues that he was unfairly prejudiced by Lori Klein's statement that he had just been released from jail. This statement was made in response to a grand juror's question about Miranda's recent employment history. While it is undesirable to refer to a defendant's criminal record before a grand jury, and it could be seriously prejudicial in some circumstances, *Commonwealth* v. *Freeman,* 407 Mass. at 282-283, such is not the case here. As in *Freeman,* the comments were not offered by the prosecution, but came in response to a juror's question; they were responsive to the question and did not go beyond the bounds required of a response; the testimony was not false or deceptive, and there is no evidence that the information was given in order to obtain an indictment. *Id.* at 283.

Miranda has not shown that any of the disputed evidence probably made a difference in the grand jurors' decision to indict. Nor has he shown that the Commonwealth tainted the grand jury process by knowingly using false testimony or "doctoring" the evidence in order to distort its probative force. See *Commonwealth* v. *Brien,* 19 Mass. App. Ct. 914, 914 (1984), and cases cited. The motion judge properly refused to dismiss the indictment based on the prosecution's failure to divulge Klein's initial denial that she knew about the robbery. The other disputed evidence created no substantial risk of a miscarriage of justice.

2. *Questioning of the prospective jury venire.* Jurors were selected from three jury pools. After the trial judge's initial remarks to the final venire, he asked whether jury service would cause anyone undue hardship. Those answering affirmatively were asked to step forward. The judge had the other prospective jurors leave the courtroom and wait in the corridor. He then questioned the "hardship" jurors individually concerning their reasons. The first juror questioned, Horace Roderick, said that he was a correctional officer at "the House of Correction," and knew the defendants in his "line of work." The judge asked him not to say anything more, and dismissed him. He also dismissed the remainder of the venire who were in the courtroom when Roderick made his statement. One of the defendants' attorneys pointed out that the back door of the courtroom had been open while Roderick was speaking. The judge replied that he was confident Roderick's words could not have been heard by the jurors who were in the corridor.

The other members of the venire who had been in the cor-

ridor were then returned to the courtroom. Among the questions the judge asked them were whether anyone in the group had any bias or prejudice in connection with the case and whether there was any reason a potential juror could not be impartial. Each was asked, individually, whether he or she had heard, seen, or read anything about the case "prior to coming in here." The two final jurors were selected from this pool.

Miranda contends that the judge should have asked the venire specifically whether they had overheard the prejudicial statements Roderick made, and that the failure to do so resulted in a substantial risk of a miscarriage of justice. The judge properly exercised his discretion in determining how to question the prospective jurors, and we find no such risk.

General Laws c. 234, § 28, as inserted by St. 1973, c. 919, provides, in relevant part, that if a juror may have been exposed to "potentially prejudicial material" which may lead him or her to make decisions based upon extraneous factors, the juror should be examined individually with regard to the possible exposure. See *Commonwealth* v. *Duddie Ford, Inc.*, 409 Mass. 387, 391 (1991). To decide whether individual voir dire is necessary, the judge must first determine whether there is a substantial risk that jurors will be influenced by extraneous factors. This determination is subject to the judge's "broad discretion." *Id.* at 392. The burden is on the defendant to show that there is a substantial risk that jurors will be so influenced. *Commonwealth* v. *Seguin*, 421 Mass. 243, 247 (1995), cert. denied, 516 U.S. 1180 (1996).

In addition to questioning the prospective jurors concerning bias, the judge provided a written narrative of the circumstances surrounding Roderick's statement.[14] According to the narrative, the courtroom is large and contains sound-reducing carpeting. Roderick made his statement while standing approximately two feet from the judge, who spoke in a conversational tone, in part to prevent the other hardship jurors, who were standing ten to fifteen feet away, from hearing him. The reporter's microphone was taped on the bench handrail between Roderick and the judge. The judge asked Roderick to speak loudly enough so that the attorneys and court reporter, who stood behind Roderick and to his side, could hear him. The judge recollected that the jurors in the corridor had been taken out through a doorway about six

---

[14]The judge's narrative of the incident appears in his decision on Miranda's motion to expand the appellate record, which is not at issue in this appeal.

to ten feet from where Roderick was standing, and that this door had been closed. It was the practice for a court officer to remain with the jurors in the corridor, keeping them together, and not permitting them to approach the doorways to listen to the courtroom proceedings.

The judge concluded that the jurors waiting outside could not have heard Roderick's statement. He added that nothing occurred during the impanelling process or the trial suggesting that Roderick had been overheard by any of the jurors. Miranda has not shown that there was a substantial risk of extraneous influence on the jurors requiring individual voir dire.

3. *Admission of codefendants' hearsay statements.* Following a hearing, and over the objections of Ali and Rose, the trial judge ruled that certain of Miranda's hearsay statements were admissible against his codefendants because sufficient evidence had been presented to show that they were engaged in a joint venture. The ruling was proper.

The testimony at issue, which the judge admitted against all the defendants, included: Cheryl Gomes's testimony that Rose and Miranda had argued about Rose's staying overnight with Gomes the night before the robbery and had mentioned Ali's participation in their plans for the next morning; and Klein's testimony about various post-robbery events, most notably Miranda's having told her that he had not been in the bank, but had waited for Ali and Rose at the water tower while they went to the bank.[15]

Out-of-court statements of coconspirators or joint criminal venturers are admissible against a defendant so long as the statements were made during and in furtherance of a criminal enterprise. *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 543 (1990), and cases cited. Such statements are admissible only if nonhearsay evidence is sufficient to establish "an adequate probability" of the criminal enterprise. *Commonwealth* v. *Cartagena,* 32 Mass. App. Ct. 141, 143-144 (1992), quoting from *Commonwealth* v. *White,* 370 Mass. 703, 709 n.7 (1976). This exception to the rule against hearsay does not apply if the criminal enterprise has ended, since the exception "is premised on a belief that '[t]he community of activities and interests which exists among the coventurers during the enterprise tends

---

[15]The judge also allowed against all defendants Klein's testimony about Miranda's buying new tires for her car and Miranda's admonishing her to keep her car away from Cotuit.

in some degree to assure that their statements about one another will be minimally reliable.' " *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 (1983), quoting from *Commonwealth* v. *White, supra* at 712. The exception does apply if "the joint venturers are acting to conceal the crime that formed the basis of the criminal enterprise." *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993).

Here, sufficient nonhearsay evidence was presented to establish "[a]n adequate probability of the existence of a common venture." *Commonwealth* v. *Bongarzone*, 390 Mass. at 340. Evidence of Ali's participation included a half dozen visits to the Miranda household in the days preceding the robbery; his participation in the secret basement meetings; his fingerprints on the fake gun used in the robbery; his conferring privately with the codefendants upon learning of the newspaper photograph of the dirt bike; the numerous phone calls made among the codefendants' residences near the time of the robbery; and his possession of seven or eight two dollar bills soon afterward. Evidence of Rose's participation included more than a dozen visits to the Miranda household in the days before the robbery; participation in the secret basement meetings; numerous rides on the red-orange dirt bike in the days before the robbery, wearing a helmet fitting the description of the helmet the bank robber wore; the theft and testing of the headphones and batteries the night before the robbery; and the phone calls among the codefendants' residences near the time of the robbery.

Ali and Rose argue that the joint criminal enterprise had terminated when Miranda made his post-robbery statements. They suggest that Miranda may have told Klein that he waited at the water tower while the others went to the bank in order to portray himself as less directly involved in the crime than his coventurers. Granting that Miranda's statement may have been meant to minimize his guilt in the eyes of Klein, there was nevertheless ample evidence that it was made in connection with his continuing pursuit of a joint effort to cover the robbers' tracks. Miranda promptly directed Klein not to use her car in the vicinity of the Cotuit water tower and planned how to prevent her son from giving away their involvement with the dirt bike used in the robbery. When Klein later told Ali about the newspaper photograph of the dirt bike, Ali said nothing to her, but immediately joined with Miranda and Rose and went to her car, where a copy of the photograph had been stashed.

There, it can be inferred, the codefendants discussed the news of the robbery and how to avoid being connected with the crime. The cleanup of the Miranda residence, and the numerous and lengthy telephone calls among the codefendants' residences during the four days following the crime, further support the inference that efforts to hide the codefendants' involvement continued for at least several days after the robbery. See *Commonwealth* v. *Angiulo*, 415 Mass. at 518-520 (declarant's statements may have been boastful, but they were admissible as statements made by a joint venturer in furtherance of a joint enterprise because they were also intended to limit the flow of information about the crime). See also *Commonwealth* v. *Simpson*, 370 Mass. 119, 122 (1976); *Commonwealth* v. *Colon-Cruz*, 408 Mass. at 544-545 (both holding that the declarants' statements, made after the commission of the crime, occurred during the pendency of and in furtherance of the joint enterprise). Compare *Commonwealth* v. *White*, 370 Mass. at 708-712, holding that the declarant's statements were made after the common enterprise had ended.

4. *The motion to sever.* Prior to trial, Rose moved to sever his trial from Miranda's on the grounds that Miranda's out-of-court statements, discussed in section 3 above, would incriminate Rose. Rose contends that the refusal to sever violated his right of confrontation under *Bruton* v. *United States*, 391 U.S. 123 (1968). Because the statements were made during and in furtherance of the codefendants' joint enterprise, no such violation occurred. See *Commonwealth* v. *Brown*, 394 Mass. 510, 515 (1985); *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994); Smith, Criminal Practice & Procedure § 1076 (2d ed. 1983).

5. *The fingerprint evidence.* Ali claims that the instructions the judge gave concerning his fingerprints found on the fake gun were unclear and failed to convey that the jury had to find that the prints were impressed during or in conjunction with the robbery. We disagree. The idea that the fingerprints had to have been imprinted on the lighter/gun in conjunction with the robbery was implicit in the judge's cautioning the jury not to consider fingerprint evidence in isolation, but to view it together with other related evidence, including the circumstances under which the fingerprints were found.[16]

The jury, viewing the fingerprint evidence together with the

---

[16]The judge instructed the jury to consider all the other evidence in the case having some relation to the fingerprint evidence in determining what, if any,

other evidence of Ali's participation in the crime, see section 3, *supra*, could have inferred that his fingerprints were transferred to the lighter prior to the robbery as he applied tape to it in order to disguise it as a gun.[17] The trial judge's instructions adequately conveyed the principle that "[f]ingerprint evidence coupled with other evidence may rationally link a defendant to a crime." *Commonwealth* v. *Morris*, 422 Mass. 254, 257 (1996), and cases cited.

The situation in this case differs from cases on which Ali relies, where it was necessary to prove that the fingerprint evidence was impressed at the time the crime was being committed. Compare *Commonwealth* v. *Fazzino*, 27 Mass. App. Ct. 485, 485-488 (1989); *Commonwealth* v. *Hall*, 32 Mass. App. Ct. 951, 951-952 (1992) (in both cases, the defendants' fingerprints were found on objects tied to the crime scene, and it was important for the jury to ascertain that they had been impressed during the crime rather than on some other occasion when the defendant may have been there); *Commonwealth* v. *Morris*, 422 Mass. at 257-260 (Fingerprints appearing on a mask found at the crime scene constituted the sole evidence linking the defendant to the crime. The Commonwealth, therefore, had to establish that they were placed there during the commission of the crime).

6. *Ineffective assistance.* Miranda argues that his trial counsel was ineffective because he did not object to the admission of testimony concerning Miranda's involvement with guns, evidence which, he contends, was more prejudicial than probative. Because the testimony was relevant and not unfairly prejudicial, trial counsel's failure to object did not render him ineffective. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96-97 (1974). Relevant evidence "tends to prove some issue in the case on trial." *Commonwealth* v. *Gordon*, 407 Mass. 340, 351 (1990), quoting from *Commonwealth* v. *Chretien*, 383 Mass. 123, 135 (1981). It "need not establish directly the proposition

significance to attach to it. He cautioned the jury not to assume that "the presence of fingerprints at the scene of a crime without any other evidence linking a particular person to the crime would be sufficient." Rather, they must "consider all the evidence . . . recognizing that guilt must always be established beyond a reasonable doubt," and could not consider the fingerprints alone without considering where and under what circumstances they were found.

[17]The tape prevented the portion of the lighter that could be recognized as a lighter from popping up when the trigger was pressed.

sought; it must only provide a link in the chain of proof." *Commonwealth* v. *Gordon, supra*, quoting from *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984).

The following testimony is at issue. Brian Mederois testified that Miranda had asked him to remove a small silver-colored automatic gun from a drawer in their home and to give it to Miranda. This incident occurred approximately three weeks before the robbery. Brian stated that the silver automatic was not the lighter/gun found in the bank manager's office. In light of two eyewitnesses' testimony that the robber was holding a gun after he left the bank manager's office, a gun identified by one as a silver automatic, Brian's testimony showed that Miranda possessed a weapon that could have been used in the robbery. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1991) (evidence that the defendant was seen carrying a handgun was properly admitted to show that he had the means of accomplishing the crime). See also *Commonwealth* v. *Hamilton*, 411 Mass. 313, 322 (1991), and cases cited.

Lori Klein testified that she accompanied Miranda to New Bedford a few days before the robbery where he attempted, unsuccessfully, to procure a gun and bullets. Miranda's attempt to procure weapons so soon before the crime was probative of his involvement in preparations to commit the armed robbery.

We see no unfair prejudice to Miranda in the admission of the testimony about his involvement with weapons. Moreover, in view of the other strong evidence presented against him, had his attorney successfully objected to the admission of the testimony, Miranda would not have gained "an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. at 96-97.

7. *Trial publicity.* During trial, an article about the bank robbery appeared in the Cape Cod Times. It referred to Ali's prior conviction for bank robbery as well as to the dismissal of a juror because of his inability to be impartial. A copy of the sports page from that issue of the Cape Cod Times was found in the jury room. The defendants requested a mistrial, and Ali requested, alternatively, that the jurors be asked whether they had read the article. The judge asked the jury collectively whether they had read the article. They all answered in the negative, and the judge went ahead with the trial after admonishing the jury to avoid reading that newspaper during the trial.

Miranda now claims that the judge's failure to question each

juror individually resulted in a substantial risk of a miscarriage of justice. The judge properly exercised his discretion in accepting the jurors' representations that they had not read the article. There was no need for individual voir dire. See *Commonwealth v. Kendrick*, 404 Mass. 298, 299-304 (1989); *Commonwealth v. Cokonougher*, 35 Mass. App. Ct. 502, 503 (1993).

*Judgments affirmed.*