# COMMONWEALTH vs. LORIN H. MIMLESS.

No. 99-P-1266.

Suffolk. June 1, 2000. - January 9, 2002.

Present: ARMSTRONG, C.J., LENK, & RAPOZA, JJ.

*Practice, Criminal,* Examination of jurors, Jury and jurors, Instructions to jury. *Jury and Jurors. Evidence,* Chart, Relevancy and materiality, Chalk drawing, Cross-examination, Business record, Motive. *Witness,* Cross-examination.

Although the defendant at a criminal trial had a constitutional right to be present while the judge questioned jurors whether they had read a certain newspaper article regarding the trial, such inquiries, in the unusual circumstances presented, were harmless beyond a reasonable doubt; where the jurors' responses did not give rise to evidence of wrongdoing or bias, the judge did not err in declining to replicate his inquiry of the jurors on the record or to allow defense counsel to interrogate the jurors. [535-537]

At a criminal trial, the judge did not abuse his discretion in admitting in evidence several summary charts offered by the Commonwealth, where the calculations contained in the charts were based on other properly admitted evidence, and where the witness who prepared the charts was available for cross-examination regarding any ambiguities contained therein [537-539]; similarly, the judge did not err in permitting the Commonwealth to use another summary chart as a chalk at trial [539-540].

At the trial of indictments charging larceny and Medicaid fraud, the judge did not err in limiting defense counsel's cross-examination of a Commonwealth witness concerning recalculations of the amount of Medicaid overpayments made to the defendant, where counsel was given the opportunity to cross-examine another Commonwealth witness on the same issue. [540-542]

A criminal defendant charged with larceny and Medicaid fraud failed to demonstrate error in the trial judge's admission in evidence of a letter from the Division of Medical Assistance [542]; in the trial judge's exclusion from evidence of certain business records, offered without an authenticating witness [542-543]; and in the trial judge's admission, with limiting instructions, of certain evidence relevant to the defendant's motive [543].

At the trial of indictments alleging larceny and Medicaid fraud, the judge did not err in allowing a Commonwealth witness to testify in response to questions exploring regulatory authorities' interpretation of their enforcement role. [543-544]

Evidence presented at the trial of indictments alleging larceny and Medicaid fraud, indicating that the defendant engaged in a conscious course of deliberate ignorance of the fact that he was overcharging the Medicaid

program, was sufficient to warrant the judge's "willful blindness" instruction to the jury [544-546], and there was no risk that the jurors believed that the judge's instruction mandated that they find willful blindness [546].

At a criminal trial, the judge properly discharged a deliberating juror for a reason personal to the juror and not related to the issues of the case or the juror's relationship with his fellow jurors. [546-547]

INDICTMENTS found and returned in the Superior Court Department on August 28, 1996.

The cases were tried before *Vieri Volterra,* J.

*Michael Kendall* for the defendant.

*LaDonna J. Hatton,* Assistant Attorney General, for the Commonwealth.

ARMSTRONG, C.J. The defendant, a psychiatrist, was convicted by a Superior Court jury of two counts of larceny over $250 in violation of G. L. c. 266, § 30, and 219 counts of Medicaid fraud in violation of G. L. c. 118E, § 40. The fraud counts were of two types: (1) billing and receiving payment for services which could not have been performed because he was on vacation; and (2) billing and receiving payment for services performed on days for which, adding together the times required for the services allegedly performed, the billings represented more than twenty-four hours of services.[1] The sentences imposed included one year of jail time that was stayed pending appeal.

1. *Publicity.* On the morning of the second day of jury deliberations, the Boston Herald printed an article about the trial, including references to extravagant spending by the defendant. When jurors began arriving at the courthouse that morning, neither a court reporter nor the parties were present. The judge stationed himself to catch the jurors as they arrived and asked them individually if they had read the article. Each juror responded in the negative. The judge took the Boston Herald from the several jurors who had it and noted (later, in the courtroom) that, based on the condition of the papers, he

---

[1] The Commonwealth agreed to enter nolle prosequis on 217 counts alleging billings representing more than fourteen but less than twenty-four hours of services on other days. On the 260 Medicaid fraud counts actually prosecuted, there were 219 convictions and forty-one acquittals.

believed that they had not been read. (The article began on page ten of the newspaper.) Using scissors, the judge clipped out the article. He then instructed each juror that he or she was not to consider any kind of extraneous sources. Once all the parties had arrived, the judge called the jury to the courtroom. He gave the jurors a strong instruction to disregard anything they might hear outside the evidence in the case, and directed them to resume deliberations. After the jury retired, the judge described his contact with jurors and his being satisfied that none of the jurors had read the article. The judge then denied the defendant's request for a more detailed, on the record, questioning of the jurors.

"When a judge conducts an inquiry about a consequential matter . . . there is a requirement, deriving from the constitutional rights of confrontation and fair trial, that the defendant and his counsel be present." *Commonwealth* v. *Martino*, 412 Mass. 267, 286 (1992), and cases cited. "The absence of the defendant from such a colloquy, however, does not automatically constitute reversible error." *Ibid.* We cannot fault the judge for taking vigorous preventive action while he could do so, at a time when neither the court reporter nor the parties were available in the courthouse. By immediate action it was possible to avoid or minimize the impact of the article. Given the unusual circumstances, and because the judge reported that "every single juror assured me that they had not read the newspaper," the judge's private communication with the jurors was harmless beyond a reasonable doubt. Compare *Commonwealth* v. *Hicks*, 22 Mass. App. Ct. 139, 147 (1986) (judge dismissed all three jurors who admitted reading newspaper article).

Once all the parties were present, the judge put the details of his communications with the jury on the record. The judge did not err by refusing to replicate his inquiry of the jurors on the record. The jurors individually had already assured the judge that they had not read the Boston Herald that morning, and the judge had a right to rely on those responses. Compare *Commonwealth* v. *Palmariello*, 392 Mass. 126, 142 (1984); *Commonwealth* v. *Ali*, 43 Mass. App. Ct. 549, 564-565 (1997). The judge had acted commendably to prevent the taint from reach-

ing the jurors; he could reasonably regard further inquiry as needlessly time-consuming. Compare *Commonwealth* v. *Francis*, 432 Mass. 353, 371 (2000). Nor was the judge required to accede to the defense request that counsel be allowed to interrogate the jurors, presumably under oath, concerning when and where they had bought their papers and the sequence of their actions prior to their arrival at the courthouse. Such an examination might have been required if the judge had evidence of wrongdoing or bias, see G. L. c. 234, § 28, but it was not required here. Compare *Commonwealth* v. *Farnkoff*, 16 Mass. App. Ct. 433, 438-439 (1983).[2]

2. *Summary charts.* The defendant was a provider under both the Medicaid program administered by the Division of Medical Assistance (division) and Medicaid's mental health and substance abuse program administered by Mental Health Management of America (MHMA). To receive payment for services rendered under these programs, the defendant submitted forms containing the treatment date and a five-digit procedural code indicating the service performed and the amount to be paid. These procedural codes, also known as service codes, were first created by the American Medical Association and published in the Current Procedure Terminology (CPT) manual. The Medicaid program and MHMA also issued definitions of the applicable procedural codes which on occasion varied from the CPT descriptions. As a provider, the defendant agreed to

---

[2]The judge did not err in denying the motion to dismiss the indictment for egregious prosecutorial misconduct. It was evident that the Boston Herald reporter had talked to a number of courthouse sources, including "investigators" and the defendant's counsel. The sole statement attributed to the prosecutor came from his closing argument. Most of the prejudicial information reported in the article had come out in the trial: the lavish vacations, the Armani and Versace suits, the three BMW automobiles, art works and other expensive purchases, and the fact that the defendant's former wife had refused to sign their joint tax return because she didn't "know of any way a psychiatrist could make that ($513,000) honestly." Unattributed was a statement that the defendant "bought lingerie for a girlfriend, as well as pornography." The prosecutor emphatically denied having made disclosures to the reporter. The judge did not err in declining to find that either the prosecution or its investigators had leaked information. Compare *United States* v. *Mitchell*, 372 F. Supp. 1239, 1247-1248 (S.D.N.Y.), appeal dismissed, 485 F.2d 1290 (2d Cir. 1973) (judge not required to accept newspaper's attribution of information to the prosecution where the prosecutor unequivocally denied it).

abide by all the laws, rules, and regulations applicable to both the Medicaid program and MHMA.

The defendant asserts that the trial judge abused his discretion when he admitted in evidence, over objection, several charts summarizing the Medicaid payments received by the defendant. Two of the challenged exhibits, nos. 31 and 34, were computer printouts containing various information about the defendant's Medicaid payments, including the service codes billed by the defendant on each treatment day, the time allegedly required to perform that service under applicable regulations, and the amount paid to the defendant. Exhibit 31 also broke out the amount the defendant was allegedly overpaid by Medicaid on each treatment day. Exhibits 33A and 33 listed the time assignments used in exhibits 31 and 34, respectively. The Commonwealth used these exhibits to illustrate the amount of time the defendant would have had to work each day to justify his Medicaid payments.

The defendant complains that exhibits 31 and 34 overestimated the time required to perform certain procedures and therefore misled the jury. "Summary charts of voluminous evidence are permissible if they are accurate and fair, although 'care must be taken to insure that summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof.' " *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. 157, 165-166 (1991), quoting from *United States* v. *Drougas*, 748 F.2d 8, 25 (1st Cir. 1984). As the Attorney General's Medicaid fraud control unit investigator, Anthony Megathlin, who prepared the exhibits, testified, the times in exhibit 31 were based on either the MHMA regulations or the division manual, both of which were entered in evidence. In response to defense counsel's suggestion that some of the times used in exhibit 31 differed from the times contained in the CPT standards, the investigator created exhibit 34, which showed the hours the defendant would have had to work under the CPT standards. That some evidence in the record contradicted certain time assignments in both exhibits did not render the printouts inadmissible. Defense counsel vigorously cross-examined the investigator about the discrepancies between the times used in

exhibits 31 and 34 and the terms of the defendant's contract with Medicaid. See *United States* v. *Sorrentino*, 726 F.2d 876, 884 (1st Cir. 1984) (summary admissible where calculations based on admitted evidence and "agent who prepared the chart was available for cross-examination concerning disputed items"). The investigator acknowledged that although he assigned thirty minutes to many of the claims for pharmacological management, coded 90862 in the printouts, neither the MHMA regulations nor the defendant's contract imposed any minimum time limit to that code. The defendant's assertion that the printouts overestimated the time required to perform the services billed went to the weight and credibility of the Commonwealth's summaries, not to their admissibility. See *United States* v. *Nivica*, 887 F.2d 1110, 1125 (1st Cir. 1989) (arguments regarding the inadequacies of summaries "go to the completeness of the underlying documents, affecting the weight rather than the admissibility of the government's summaries"), cert. denied, 494 U.S. 1005 (1990).[3]

The same was true of "exhibit X," a thirty-four page bar chart depicting the hours the defendant billed Medicaid each day from March 15, 1993, to December 15, 1995, which was used as a chalk at trial. "A judge . . . has 'considerable, but not unrestrained, discretion as to the degree to which chalks can be used.' " *Commonwealth* v. *DiFonzo*, 31 Mass. App. Ct. 921, 923 (1991), quoting from *Commonwealth* v. *Walter*, 10 Mass. App. Ct. 255, 264 (1980). Exhibit X assembled data from claims submitted by the defendant and from remittance advice forms received by the defendant. While the defendant did not see the chalk until the first day of trial, he had sufficient access to the underlying information prior to trial. Defense counsel effectively highlighted the chalk's inaccuracies during cross-examination.

Likewise, the judge's ruling that Megathlin was qualified to testify about the hours and overpayment calculations in the

---

[3]The defendant also contends that the Commonwealth's presentation of the time calculations in exhibits 31 and 33A during the grand jury proceedings impaired the integrity of the grand jury. Because the time calculations in exhibit 31 were not misleading, the defendant's motion to dismiss the indictments was properly denied. See *Commonwealth* v. *McGowan*, 400 Mass. 385, 388 (1987) (no showing of fundamental unfairness where Commonwealth failed to provide defendant's version of events to grand jury).

summary charts was proper. As noted above, Megathlin's time assignments were based on MHMA and division regulations and CPT code standards. Any ambiguities regarding these calculations presented an issue of weight and credibility for the jury, rather than an issue of admissibility. See *Doherty* v. *Belmont*, 396 Mass. 271, 276 (1985).

3. *Limitation of cross-examination.* The defendant complains that the judge committed reversible error by limiting defense counsel's cross-examination of Megathlin concerning his overpayment calculation. On direct examination, Megathlin was allowed to testify that, by his calculation, the defendant received $180,000 in overpayments from Medicaid. The calculation assumed that the defendant saw a limited number of patients for the full time required under the procedural code billed and did not see the remaining patients billed to the same day. That is to say, Megathlin totaled the time required to provide each procedure billed on a particular day until he reached fourteen hours' worth of the defendant's services. Any payments received by the defendant for procedures performed on other patients after this fourteen-hour limit were treated as overpayments. (The chart seems to have been geared to the counts originally presented, before the prosecutor agreed to limit the proof to the counts representing time in excess of twenty-four hours per day. See note 1, *supra*.)

On cross-examination, defense counsel attempted to show that Megathlin's overpayment calculation was inflated by asking him to recalculate what the overpayment would be if, as the defendant contended, the defendant rendered services to all of the patients billed for but mistakenly billed under a more expensive procedural code than the time spent warranted.[4] The Commonwealth objected and the judge excluded that line of inquiry.

"[A]lthough the defendant [was] entitled to a reasonable

---

[4]For example, a psychotherapy session lasting forty-five to fifty minutes would be billed under procedural code no. 90844, whereas a psychotherapy session under twenty minutes could be billed under procedural code no. 90841, and one lasting between twenty and thirty minutes could be billed under no. 90843. (Oddly, there was no code for the period of thirty-one to forty-five minutes.) The defendant billed for most if not substantially all psychotherapy sessions under procedural code no. 90844.

cross-examination of the witnesses, the scope of the cross-examination rest[ed] largely in the sound discretion of the trial judge." *Commonwealth* v. *Montez*, 45 Mass. App. Ct. 802, 810 (1998), citing *Commonwealth* v. *Daye*, 411 Mass. 719, 735 (1992). Here, defense counsel cross-examined Megathlin extensively about mistakes made in his summary charts and ambiguities in the time requirements assigned to the codes used by the defendant. Defense counsel elicited from Megathlin that the defendant could have seen all of the patients billed on a particular day and, under such circumstances, would have been entitled to reimbursement under a lower paid procedural code. Recalculated in that manner, defense counsel argued, the column shown as overpayment would be sharply reduced.

The trial judge excluded the line of inquiry calling for Megathlin to do the recalculation. The judge's position was that the defendant, by using the billing codes he did, represented that he spent the time with the patient so billed; the judge refused to allow speculation as to the amount of the overpayments based on the use of other codes. Had matters been left there, we would be concerned that the judge had foreclosed a line of inquiry that had grounding in the evidence: namely, that the defendant in fact saw all the patients he billed for but billed them on a code that represented more time than was actually spent. As the lengthy trial progressed, however, the judge allowed the defense to make exactly the same point in its cross-examination of another witness, Robert Russo, another investigator assigned to the Medicaid fraud control unit of the Attorney General's office. Through him the defense brought out that the recalculation would bring the overpayment down to $73,000, a figure that Russo agreed represented less than five per cent[5] of the $1.3 million the defendant had billed in the three-year period covered by the indictments.

Since the information sought of Megathlin came in through Russo, the defendant's right of cross-examination was not infringed. Contrary to the defendant's assertion, the judge's subsequent instruction to the jury to disregard defense counsel's statements regarding the damage calculations in his closing did not preclude the jury from considering Russo's testimony. The

---

[5]Seventy-three thousand dollars is actually 5.62 per cent of $1.3 million.

point of the judge's instruction was that the jury's function was not to determine damages but simply to determine whether the defendant billed for services in excess of those performed.

4. *Withhold order.* In February, 1996, the division imposed a withhold order on payments to the defendant for further services rendered to his Medicaid patients. The defendant claims the judge erred in allowing in evidence copies of the withhold notification letter and applicable State regulations. It was the defendant, however, who sought to show the withholding, which ultimately amounted to $238,000, both to suggest that the defendant, by continuing to serve his Medicaid patients for fifteen months without compensation, had already more than repaid the maximum amount the investigators determined to have been overcharged, and to question the defendant's former wife about the withheld funds to show bias. The judge, in the exercise of his discretion, properly admitted the withhold notification letter and the applicable State regulations to clarify for the jury the circumstances surrounding the withholding. Moreover, it was clear from the text of the notification letter that it did not represent a final determination of the defendant's culpability by any State agency. Contrast *Gram* v. *Liberty Mut. Ins. Co.,* 384 Mass. 659, 673 n.11 (1981). The judge instructed the jury, moreover, that "you may draw[] no adverse inferences towards the defendant because of the withhold."[6]

5. *Kandimalla evidence.* The judge did not err in excluding from evidence hospital discharge cards received by and claim forms created by Seetha Kandimalla, one of the defendant's former secretaries. General Laws c. 233, § 78, provides that a court may, in its discretion, require, as a condition to admissibility of business records, that the party offering the evidence call as a witness one who has personal knowledge of the facts stated in the records. *Burns* v. *Combined Ins. Co.,* 6 Mass. App. Ct. 86, 92 (1978). See also *Sellew* v. *Tuttle's Millinery, Inc.,* 319 Mass. 368, 371 n.1 (1946). The excluded hospital cards were received from the defendant by Kandimalla and then used

---

[6]The judge's instruction that the fact that the defendant acquiesced in the withholding did not constitute a defense to the charges of larceny by false pretenses was proper. See *Commonwealth* v. *Hildreth,* 30 Mass. App. Ct. 963, 965 (1991); *Commonwealth* v. *Lewis,* 48 Mass. App. Ct. 343, 345 n.3 (1999).

by Kandimalla to create claim forms. Kandimalla did not, however, testify at trial. Instead, the defendant attempted to introduce the hospital cards and claim forms prepared by Kandimalla through another secretary who neither received the disputed cards from the doctor nor created the claim records. Without Kandimalla to authenticate the disputed documents, it was within the judge's discretion to exclude them. See *Burns* v. *Combined Ins. Co., supra.*

6. *Evidence of motive.* Over the defendant's objection, the judge admitted evidence of the defendant's personal expenditures, including evidence that during the time of the alleged overbilling, the defendant spent over $247,000 in credit card purchases, bought expensive clothing, and owned three luxury automobiles. It was not an abuse of discretion to deem that evidence relevant to the Commonwealth's theory that the defendant defrauded the Medicaid program in order to support his wealthy lifestyle. See *Commonwealth* v. *Burns,* 49 Mass. App. Ct. 677, 684 (2000), quoting from *Commonwealth* v. *Ashley,* 427 Mass. 620, 624-625 (1998) ("Determination of the weight of [motive] evidence is for the jury, and evidence which merely suggests rather than 'clearly shows' a motive for the crime may still be ruled admissible. There is no requirement that evidence [of motive] be conclusive in order to be admissible"). See also *Commonwealth* v. *Jacobson,* 19 Mass. App. Ct. 666, 680 (1985). Any prejudice to the defendant caused by the expenditure evidence was minimized by the judge's exclusion of the most inflammatory items and by his instruction to the jury "to draw no adverse inferences against [the defendant] with respect to spending a lot of money on credit card charges but, rather, only focus[] on the limited issue of motive." See *Commonwealth* v. *Conkey,* 430 Mass. 139, 145 (1999). There was no error.

7. *Testimony regarding State regulations.* The defendant argues that the judge erred by allowing Commonwealth witnesses to testify as to whether certain hypothetical conduct would violate particular State regulations.[7] While the question is close, we think that the judge, acting in his discretion, could

---

[7]For example, after discussing the regulation defining "date of service," 130 Code Mass. Regs. § 450.231(B) (1995), the prosecutor asked the

properly regard the questions as ones exploring how the regulatory authorities interpreted their enforcement roles. The defendant's counsel were particularly effective in bringing out in cross-examination how the authorities were misinterpreting certain regulations and were overlooking differences in the requirements of the regulations depending on the procedural code used. As to the point most strenuously argued, that the witnesses were allowed in effect to testify that the defendant had violated the regulations, the judge specifically instructed the jury that "[y]ou, the jury, will decide whether or not . . . the defendant in this case violated any one of these regulations . . . . That will be a question that only you, the jury, can say."[8] The judge's clear and immediate instruction dispelled any risk of harm to the defendant and there was no error.

8. *Willful blindness instruction.* A willful blindness instruction is appropriate when (1) "a defendant claims a lack of knowledge," (2) "the facts suggest a conscious course of deliberate ignorance, and" (3) "the instruction, taken as a whole, cannot be misunderstood [by a juror] as mandating an inference of knowledge" (citation omitted). *United States* v. *Hogan*, 861 F.2d 312, 316 (1st Cir. 1988). Contrary to the defendant's claim, there was sufficient evidentiary basis for the judge's willful

---

division's benefits service budget manager, "If a provider was providing service to a person on a certain date of service and changed it to another date of service, would that be in violation of that regulation?" She replied, "Yes."

And after discussing the regulation defining "overpayment," 130 Code Mass. Regs. § 450.234 (1995), the prosecutor asked, "[I]f the provider were to bill for services that they didn't perform, would they be in violation of this regulation?" Again, she answered, "Yes."

[8]Another evidentiary contention concerns testimony by the defendant's former wife, the contention being that the judge allowed her to testify to private conversations she had with the defendant when they were married, in violation of G. L. c. 233, § 20. The difficulty with the argument is that the judge, in all instances but one, precluded or struck such testimony where it became apparent that private conversations were the source of the wife's knowledge. It was evident, for example, that she learned of several of the trips the defendant took without her from her children. Moreover, there were other witnesses who testified concerning the defendant's vacations, so that the wife's testimony concerning the vacations was cumulative. See *Commonwealth* v. *Zezima*, 365 Mass. 238, 242 (1974). The judge correctly precluded the defendant's former wife from testifying about her conversation with the defendant regarding the 1994 tax return.

blindness instruction.[9] Experts in psychiatry testified that psychiatry is a time-oriented specialty and that psychiatrists, such as the defendant, receive significant instruction on the time required to perform various services. As a Medicaid provider, the defendant received the division's manual and additional written communications describing the treatment associated with each procedural code. The manual contained billing instructions and directed providers with billing related questions to contact the program's fiscal intermediary. Moreover, the defendant had personal experience billing, as he prepared and submitted his own Medicaid reimbursement claims during the first six months of his private practice.

Despite the need for accurate billing records, the evidence established that the defendant hired secretaries with no prior billing experience. Former secretaries of the defendant testified that the defendant taught them how to bill and that they received all of the billing information, including the particular code to be billed, from the defendant. Although the defendant received all of the remittances and payments from Medicaid, he never

---

[9]After instructing that the Commonwealth must prove beyond a reasonable doubt that the defendant did not act because of ignorance, mistake or misunderstanding, the judge provided the following willful blindness instruction:

> "[I]f the Commonwealth has proved to you beyond a reasonable doubt that the defendant deliberately closed his eyes as to what would have been obvious to him, then, under such circumstances . . . that element [knowledge] you would be warranted in determining has been shown. So a finding beyond a reasonable doubt by the jury of an intent of the defendant to avoid knowledge or enlightenment would permit the jury to infer such knowledge. . . . Stated another way, a defendant's knowledge of a particular fact may be inferred from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact.

> "In other words, you, the jury, would be warranted in determining that the defendant had acted knowingly if you find that the Commonwealth has shown beyond a reasonable doubt either, one, that the defendant actually knew that he had made or caused to be made false statements on applications for payment to the Division of Medical Assistance or its contractor, UNISYS or MHMA; or, two, alternatively, that he deliberately closed his eyes to what he had every reason to believe was the fact."

directed his secretaries to correct payments for services he did not perform, such as those supposedly rendered while he was on vacation. See *United States* v. *Nivica*, 887 F.2d 1110, 1114 (1st Cir. 1989) ("[g]uilty knowledge may be inferred where instances of fraud are repeatedly brought to a defendant's attention without prompting alteration of his facilitative conduct"). The evidence indicating that the defendant deliberately closed his eyes to the fact that he was overcharging the Medicaid program was sufficient to support the willful blindness instruction.

The judge consistently instructed the jury that they "may" draw an inference of knowledge, see *United States* v. *Cassiere*, 4 F.3d 1006, 1024 (1st Cir. 1993), and that neither negligence, error, nor mistake constituted a proper basis for finding knowledge. We discern no risk that jurors believed that the judge's instruction mandated that they find willful blindness. See *United States* v. *St. Michael's Credit Union*, 880 F.2d 579, 585 n.1 (1st Cir. 1989). Contrast *United States* v. *Littlefield*, 840 F.2d 143, 148 n.3 (1st Cir.) (the danger of an improper willful blindness instruction is "the possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he should have known [an illegal act] was taking place") (citation omitted), cert. denied, 488 U.S. 860 (1988).

9. *Discharge of a deliberating juror.* During deliberations, the judge learned that the son of one of the jurors had alleged that the juror had a grievance against the Commonwealth and was going to mistry the defendant's case purposely. The judge held a hearing and concluded that the son "suffers from serious psychiatric problems," and that no reason had appeared to discharge the juror.

Over defense counsel's objection, the judge then conducted a voir dire with the juror during which he explained to the juror the allegations made by his son and inquired whether the juror thought that those allegations would affect his fairness and impartiality as a juror. The juror responded that it would not, and the judge concluded that there was no reason to discharge the juror. Later that day, the juror asked to see the judge. The juror informed the judge that, due to his problems with his son,

he could not concentrate, and that he was concerned about his heart condition. The judge concluded that good cause existed and, over defense counsel's objection, dismissed the juror.

The judge had a duty to insure that the juror in question was capable of performing his duties. The initial voir dire with the juror was not improper; the jury were not sequestered, and the juror would probably learn of his son's allegations if he did not know already. The juror's subsequent indication that he was distracted by the problems with his son and worried about his own heart condition gave the judge good cause to dismiss the juror. "We do not . . . require jurors to serve at their peril." See *Commonwealth* v. *Leftwich*, 430 Mass. 865, 874 (2000). The reason for the discharge was personal to the juror; it had "nothing whatever to do with the issues of the case or with the juror's relationship with his fellow jurors." *Commonwealth* v. *Connor*, 392 Mass. 838, 844-845 (1984).

10. *Conclusion.* A final thought is in order. The defendant's trial was long and thorough, hard fought by capable counsel on both sides. The defendant's counsel were particularly skillful in cross-examination, disclosing fully the weaknesses in the Commonwealth's case, and ably developing an alternate interpretation of the facts: that the defendant was an exceptionally busy doctor who served large numbers of patients with clinical skill, but who was careless in record keeping; that, made aware of the overbillings, he cooperated fully in repaying the overcharges, continuing to serve his patients long after his Medicaid income was cut off. The differing interpretations of the defendant's conduct were sharply drawn in a trial notable for its thoroughness. The choice was for the jurors, who demonstrated the closeness of the trial by the length of their deliberations. The trial was a fair one, and we see no adequate reason to disturb the verdicts.

*Judgments affirmed.*